# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

_____

## NO. 03-05-00504-CV
_____

**Cox Texas Newspapers, L.P. d/b/a The Smithville Times; Cox Texas Partners, Inc. d/b/a The Smithville Times; and Tyanna Tyler, Appellants**

**v.**

**Charles Penick, Appellee**

_____

### FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT
### NO. 24,252, HONORABLE VANN CULP, JUDGE PRESIDING
_____

## O P I N I O N

Appellants Cox Texas Newspapers, L.P. d/b/a the *Smithville Times*, Cox Texas Partners, Inc., d/b/a the *Smithville Times*, and Tyanna Tyler ("Cox Newspapers" and "Tyler" or, collectively, "appellants")[1] bring this interlocutory appeal challenging the district court's partial denial of appellants' motion for summary judgment in a defamation action brought by appellee Charles Penick. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(6) (West Supp. 2006).

District Attorney Penick, a public figure, filed suit claiming that he had been defamed in thirteen publications (including articles, an editorial series, and letters to the editor regarding a murder trial prosecuted in part by Penick) appearing in the *Smithville Times* between August 2, 2001, and January 3, 2002. The district court granted appellants' summary judgment motion regarding

---

[1] The *Smithville Times* is owned by Cox Texas Newspapers, L.P.

nine of the publications but denied their motion regarding four of the publications, which appeared on October 18, December 13 and 20, and January 3.**²** On appeal, Cox Newspapers and Tyler assert that the district court erred in concluding that a genuine issue of material fact remained about whether these four publications were of a libelous nature because (1) the October 18 editorial was not "of and concerning" Penick, (2) the December 13 and January 3 articles and the December 20 letter to the editor were substantially true, and (3) Penick failed to present any evidence of actual malice regarding any of these four publications.

Because Penick fails to present any evidence to demonstrate that the October 18 article was "of and concerning" him or that any of the disputed publications were published with actual malice, we will reverse the portion of the district court's order that denied appellants' summary judgment motion as to these four publications and render a take-nothing judgment in favor of appellants.

---

**²** Summary judgment was granted as to one article published on August 2 because Penick failed to file suit on this article within the one-year statute of limitations. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.002 (West 2002). Summary judgment was granted on eight of the remaining editorials and letters to the editor because there was not sufficient evidence to raise a genuine issue of material fact on any of the elements essential to maintain a defamation action by a public figure. *See Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 423 (Tex. 2000) (setting forth elements).

Interlocutory appeal of the portion of the order granting appellants' summary judgment motion is not permitted by section 51.014(a)(6). Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(6) (West Supp. 2006). Our review is therefore limited to whether summary judgment was appropriately denied on Penick's claims related to the October 18 editorial, the December 13 and January 3 articles, and the December 20 letter to the editor.

2

**BACKGROUND**

This action arises out a series of articles, editorials, and letters to the editor published in late 2001 and early 2002 in the *Smithville Times* regarding the investigation of Stacey Stites's murder and the subsequent trial of her accused murderer, Rodney Reed. On April 23, 1996, the body of Stacey Stites, a 19-year-old woman, was discovered partially undressed beside a country road in Bastrop County. Stites had been sexually assaulted and strangled. Initially, the victim's fiancé, Jimmy Fennell, Jr., a Giddings police officer, was a suspect, but DNA evidence from semen found in Stites's body diverted the focus to Rodney Reed. Reed was arrested, tried, and convicted of capital murder. He was then sentenced to death in 1998.[3] Appellee Charles Penick was the Bastrop County District Attorney at the time of Reed's trial. Penick enlisted the Attorney General's office to lead the prosecution. Assistant Attorney General Lisa Tanner was assigned to the case and acted as chief prosecutor.

The *Smithville Times* covered the story of the murder investigation and Reed's trial from 1996 through 2002.[4] Appellant Tyanna Tyler, a reporter for the *Smithville Times*, was initially assigned in 2001 to cover a writ of habeas corpus proceeding in which Reed's attorney asserted that DNA evidence from saliva found on beer cans near Stites's body had been suppressed during the trial by the prosecution. Testing of the DNA evidence ruled out Reed as a donor but could not exclude two police officers who were friends of Fennel, the initial suspect in the murder.

---

[3] Reed continues to appeal the verdict. His application for writ of habeas corpus is currently pending before the Texas Court of Criminal Appeals. *Ex parte Reed*, Cause No. WR-50, 961-03.

[4] Many other local and state publications reported the story, including the developing allegations of official misconduct. These included the *Bastrop Advertiser*, the *Austin American-Statesman*, the *Austin Chronicle*, *Texas Monthly*, and others.

Thereafter, Tyler continued to research Reed's case.  She read the trial record and investigative files and interviewed Reed, his family, friends, and defense counsel.  Tyler also asked David Fisher—a local citizen who had previously conducted his own independent investigations of public employees—to look into the "inconsistencies" of the Reed case.  Tyler used some of Fisher's research in her articles.

Tyler authored a series of ten editorial articles highlighting why "reasonable doubt" existed in the Reed case and who may have acted inappropriately in their official capacity.  The *Smithville Times* ran the editorial series from August 2 to October 18, 2001.  Eight of the editorials present a detailed review of the evidence and are void of commentary about the prosecution.  Only the opening and closing editorials, published on August 2 and October 18, contain Tyler's criticism of the prosecution.  In both, Tyler refers expressly to Assistant Attorney General Lisa Tanner.  Penick is never mentioned in the ten-part editorial series by name or by title.

In early December 2001, Fisher filed a complaint with the Travis County District Attorney's Special Prosecution Public Integrity Unit against Penick, Tanner, Attorney General Greg Abbott, and the Capital Litigation Division of the Attorney General's office.  Fisher's complaint alleged violations of Reed's constitutional rights, prosecutorial misconduct, and a "conspiracy to commit fraud."  The *Smithville Times* reported Fisher's filing on December 13, 2001, in an article with the headline "Fraud Charges filed on DA in Reed Case."  This article was not part of the ten-part editorial series, which had concluded on October 18.  Although the December 13 article accurately reported the substance of Fisher's complaint, it is undisputed that this article contained three errors—namely, that (1) Fisher's complaint had been filed with the Attorney General's office,

4

(2) Tanner had asserted at trial that she had made every effort to deliver a May 13 lab report to the defense, and (3) the chief counsel for the court of criminal appeals had advised Fisher to contact the FBI or Judge Towslee.

In the next issue published on December 20, 2001, the *Smithville Times* printed a letter to the editor written by Fisher titled, "Fisher appologizes [sic] for errors."[5]  The letter thanked the paper for reporting on the charges that he filed against Penick and Tanner and offered corrections to the three errors contained in the December 13 article.  Specifically, Fisher's December 20 letter stated that "the resulting few errors that need to be restated are my fault":

> First, I filed the complaint with the Travis County District Attorney's Special Prosecution/Public Integrity Unit, not with the Attorney General's Office.
>
> Second, it was at the hearing that Lisa Tanner asserted that she made every effort to deliver the May 13th lab report to the Defense, not at the trial.
>
> Third, George Wetzel, Counsel of the Court of Criminal Appeals did not advise me to contact the FBI or Judge Towslee.  The FBI asked that I notify Judge Towslee and [Reed's] attorney of my findings.

On January 3, 2002, the *Smithville Times* published a year-in-review article that highlighted prominent headlines from the year 2001, catalogued by month.  Under the "December" heading, one headline read "Fraud charges filed on D.A. in Reed case by citizen in county."  The

---

[5]  Fisher had first written a letter to the editor published on August 23, 2001, in which he acknowledged that "a reporter" had requested that he look into the Reed case and presented the readers with some of his findings about inconsistencies in the evidence presented at Reed's trial. In this letter, Fisher also commented on Penick's decision not to seek reelection.  The letter was titled "Reader asks DA Penick, 'Which is it?'"

headline had been altered from its original publication to include "by citizen in county." Otherwise, there was no further explanation of the content of the article as originally printed.

Penick filed suit against Cox Newspapers and Tyler asserting that he had been defamed by the articles, editorial series, and letters to the editor published in the *Smithville Times* between August 2, 2001, and January 3, 2002. Appellants sought both a traditional and a no evidence summary judgment on all of Penick's claims. *See* Tex. R. Civ. P. 166a(c), (i). The district court granted partial summary judgment in appellants' favor on nine of the thirteen disputed publications but ruled that a genuine issue of material fact remained as to the defamatory character of the four publications on October 18, December 13 and 20, and January 3.

Cox Newspapers and Tyler now bring this interlocutory appeal of the district court's order, urging that the court erred by not granting summary judgment as to these four publications on the basis that Penick failed to produce any evidence on at least one element of his defamation claims regarding each publication or, alternatively, because appellants conclusively disproved at least one element of each of his claims as a matter of law. Specifically, appellants claim that no genuine issue of fact remains about the defamatory nature of any of the four publications because (1) the October 18 editorial is not "of and concerning" Penick, (2) the December 13 and January 3 articles and the December 20 letter to the editor and are substantially true, and (3) none of these publications was published with actual malice.

## ANALYSIS

**Standard of Review**

When a party seeks both a traditional and a no evidence summary judgment, we first review the trial court's summary judgment under the no evidence standards of rule 166a(i). *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the nonmovant failed to produce more than a scintilla of evidence raising a genuine fact issue on the challenged elements of his claims, then there is no need to analyze whether the movant's summary judgment proof satisfied the traditional summary judgment burden of proof under rule 166a(c). *Id.*

A no evidence motion for summary judgment must be granted if, after an adequate time for discovery, (1) the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial, and (2) the nonmovant fails to produce more than a scintilla of summary judgment evidence raising a genuine issue of material fact on those elements. Tex. R. Civ. P. 166a(i). In a case where the trial court's judgment does not specify the grounds relied upon for its ruling, the summary judgment must be affirmed if any of the theories advanced is meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989); *Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 692 (Tex. App.—Austin 2005, pet. denied).

In reviewing a no evidence summary judgment, we "must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion" to determine whether more than a scintilla of evidence was presented on the challenged elements of the nonmovant's claim. *City of Keller v. Wilson*, 168 S.W.3d 802, 825 (Tex. 2005); *Perdue v. Patten Corp.*, 142 S.W.3d 596, 604 (Tex. App.—Austin 2004, no pet.). More

7

than a scintilla of supporting evidence exists if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id*. (quoting *Kindred v. Con/Chem, Inc*., 650 S.W.2d 61, 63 (Tex. 1983)). Because the propriety of granting a summary judgment is a question of law, we review the trial court's decision *de novo*. *Natividad v. Alexsis, Inc*., 875 S.W.2d 695, 699 (Tex. 1994). Likewise, summary judgment is reviewed in public figure or public official defamation cases under the same standard as in other cases. *See Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 423 (Tex. 2000) (holding that "we decline to adopt the clear-and-convincing standard at the summary judgment stage of a public-figure defamation case").

To prevail in a defamation case, a plaintiff who is a public official or figure must prove that the defendant (1) published a false statement about the plaintiff, (2) that was defamatory, (3) while acting with actual malice. *Id.* at 420; *see also Grotti v. Belo Corp.*, 188 S.W.3d 768, 774 (Tex. App.—Fort Worth 2006, pet. denied).

**"Of and Concerning"**

As Penick concedes, to prevail on his defamation claim, he must produce evidence that the disputed publications were "of and concerning" him. *See New York Times v. Sullivan*, 376 U.S. 254, 288 (1964); Robert D. Sack, *Sack on Defamation* § 2.9 (3d ed. 2006). "There must be evidence showing that the attack was read as specifically directed at the plaintiff." *Rosenblatt v. Baer*, 383 U.S. 75, 81 (1966). In other words, the publication "must refer to some ascertained or ascertainable person and that person must be the plaintiff." *Newspapers, Inc. v. Matthews*, 339

8

S.W.2d 890, 893 (Tex. 1960); *see also Huckabee*, 19 S.W.3d at 429 (documentary film's false statement regarding "single family court" was not expressly or implicitly directed at plaintiff in particular, so was not defamatory). Even if the plaintiff is not expressly named, the plaintiff may satisfy his burden on the "of and concerning" element by offering proof that persons acquainted with the plaintiff would understand the publication to refer to him. *Matthews*, 339 S.W.2d at 894; *see also Harvest House Publs. v. The Local Church*, 190 S.W.3d 204, 213-14 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *Eskew v. Plantation Foods, Inc.*, 905 S.W.2d 461, 462 (Tex. App.—Waco 1995, no writ); *Poe v. San Antonio Express-News Corp.*, 590 S.W.2d 537, 542 (Tex. App.—San Antonio 1979, writ ref'd n.r.e.).

Here, Penick does not deny that he was never mentioned by name or office in the October 18 article, nor in any of the other nine editorials authored by Tyler from August 2 to October 18. In relevant part, the October 18 article reads:

> Reasonable doubt exists in this case. In fact, I am of the opinion that the whole case is flawed from the word go, and that the U.S. Justice Department needs to launch an investigation. I am aware that the Attorney General's Office has launched a criminal investigation into this case. I have heard rumors of jury rigging, evidence tampering, witness intimidation, document fraud, and illegal magistration [sic] charges, which could prove to be true. I have overheard Judges and Attorneys make statements like, they "wouldn't touch this case with a ten-foot pole because it had Towslee's fingerprints all over it," and "it was not something that they even wanted to think about."

> * * * *

> The entire prosecution's case was based on a false premise. A dead body found in a partial state of undress does not constitute aggravated sexual assault resulting in murder. Minimal semen cells logically don't support recent or 'fresh' semen nor do they prove sexual assault. Anytime there is prosecutorial and defensive evidence sealed during the pre-trial phase obviously there are some problems evident.

9

> Anytime you have one law enforcement agency keeping evidence from another one, which supersedes it, you have problems with evidence and the investigation.

The article then details several actions by various police officers that Tyler felt demonstrated why the "case is flawed from the word go." For example, the article discusses that the original suspect's vehicle was not properly inventoried, that crime scene photos went undeveloped for fifteen months, that DNA testing was never conducted on available samples, and that multiple police reports were flawed or inconsistent with other evidence. In so doing, the article specifically names four officers, refers multiple times to "the DPS," and references the medical examiner by title. The article then discusses the actual evidence presented in the case, with Tyler's commentary about various inconsistencies. The article specifically names Judge Towslee, noting problems with the orders he had entered in the case, and names the "State's Appointed Special Prosecutor, Lisa Tanner," stating that she "had been brought before the State Bar for prosecutorial misconduct and allegations about the evidence suppression in this case." The article concludes by characterizing the Rodney Reed case as one that could become the "case in point" to "fix the problems of the indigent defense practices in the State of Texas." Although the article criticizes the manner in which the prosecution was conducted, only the Attorney General's office and Tanner are named in this critique. Nowhere in the October 18 article is Penick mentioned, either by name, title, or implication.

At best, a connection could be drawn between Penick and the October 18 article on the basis that, as the District Attorney, he was responsible for supervising prosecutions in Bastrop County. Penick cites *Sellards v. Express-News Corporation* for support. *See* 702 S.W.2d 677, 680 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) ("When a group is named and the plaintiff is a

readily identifiable member of the group, a cause of action for defamation exists if those who know and are acquainted with the plaintiff understand the article refers to the plaintiff."). In *Sellards,* a private citizen sued for defamation when a car crash, in which she was a passenger, was described by a reporter as a "drug-induced suicide." *Id*. at 678. The wording of the publication could have been interpreted as meaning that all passengers of the car were involved in drugs or suicide. *Id.* at 680. Though the plaintiff was not named as a passenger in the car, those who knew her were aware that she was a passenger in the car. *Id*. Thus, the article was "of and concerning" the plaintiff. *Id*.

However, the United States Supreme Court has set a separate standard for public officials who supervise government agencies. *Sullivan*, 376 U.S. at 289. An impersonal attack criticizing the actions of a governmental agency without referring specifically to its agents, without more, will not support a claim of libel by the head of that agency. *Id*. (statements criticizing police operations were insufficient to establish libel against county commissioner who was responsible for oversight of police department). In *Sullivan*, the Court held that "the bare fact that the [county commissioner plaintiff] was in overall charge of the Police Department and, thus, bore official responsibility for police conduct" was insufficient to support the plaintiff's claim that he had been personally attacked by an article criticizing police operations. *Id*. The *Sullivan* Court further explained that:

> to the extent that some of the witnesses thought the [plaintiff] to have been charged with ordering or approving the conduct or otherwise being personally involved in it, they have based this notion not on any statements in the [publication], and not on any evidence that he had in fact been so involved, but *solely on the unsupported assumption that, because of his official position, he must have been*.

11

*Id*. at 289 n.28 (emphasis added). Because the statements in *Sullivan* referred to only the governmental agency supervised by the plaintiff, without "mak[ing] even an oblique reference to [plaintiff] as an individual," they were not defamatory as a matter of law. *Id.* at 289; *see also Huckabee*, 19 S.W.3d at 429 (statement that "was [] a criticism of the family courts in general and not of Judge Huckabee in particular" was not actionable).

The Supreme Court reaffirmed its *Sullivan* holding in *Rosenblatt v. Baer*, stating that a public figure plaintiff may not prevail in a defamation claim based on an article criticizing "a small group acting for an organ of government, only some of whom were implicated, but all of whom were tinged with suspicion." *See* 383 U.S. at 82. According to the Court, "[a] theory that the column cast indiscriminate suspicion on the members of the group responsible for the conduct of this governmental operation is tantamount to a demand for recovery based on libel of government, and therefore is constitutionally insufficient." *Id*. at 83.

The holdings of *Sullivan* and *Rosenblatt* were succinctly summarized by the Supreme Court of Virginia, as follows:

> [T]he use of the "small group theory" alone as the basis for satisfying the "of and concerning" element of a common law defamation action against a governmental actor does not survive constitutional scrutiny. . . . A member of a governmental group against which an allegedly defamatory statement is made can sustain a common law action for defamation only if that member can show the statement specifically implicated that member or each member of the group. Such implication can be shown by extrinsic evidence, but evidence that others "understood" the implication based solely upon a plaintiff's membership in the referenced group will not satisfy the "of and concerning" requirement.

*Dean v. Dearing*, 561 S.E.2d 686, 689 (Va. 2002) (citations omitted).

12

Although Penick was involved in the prosecution, there is no evidence to show that readers would associate the article's criticism with him individually. *Newspapers*, 339 S.W.2d at 289-290; *Sellards*, 702 S.W.2d at 680. Accordingly, under the standard announced in *Sullivan* and *Rosenblatt*, Penick cannot establish that the October 18 article is "of and concerning" him based solely on the fact that he supervised those specifically named or because he assumed that his status as a public figure would cause people to associate him with the article. *See Rosenblatt*, 383 U.S. at 82-83; *Sullivan*, 376 U.S. at 289.

Acknowledging that the October 18 article never mentions him, Penick urges this Court to look outside the four corners of the article and consider whether a reader would have associated the article with him based on other publications in the *Smithville Times* that were not included in the ten-part editorial series—namely, an August 23 letter to the editor written by Fisher and a September 20 article written by editor Metta Johnson.[6] Penick cites *Buck v. Savage*, 323 S.W.2d 363 (Tex. App.—Houston 1959, writ denied), and *Gibler v. Houston Post Co.*, 310 S.W.2d 377 (Tex. App.—Houston 1958, writ denied), in support. Both *Buck* and *Gibler* involved articles that made reference to an individual who, by the "circumstances" in the article, might be readily identified. *See Buck*, 323 S.W.2d at 376-77; *Gibler*, 310 S.W.2d at 385. Penick uses these cases to support quite a different assertion—that one article referencing a governmental group may be

---

[6] As support for the "of and concerning" element, Penick also points to the subsequently-published December 13 and January 3 "Fraud Charges Filed on D.A." article and headline. Even if we were to consider other publications in determining whether the October 18 article was "of and concerning" Penick, we could not include the December and January articles in such a review because they had not been published at the time of the October 18 article.

13

deemed "of and concerning" an unidentified member of the group if that individual's name has been used in past articles appearing in the same periodical.

Penick has cited no authority for this theory. Examining all related publications is an accepted practice when evaluating the issue of actual malice because it can illuminate a personal vendetta of the defendant, which demonstrates the defendant's state of mind at the time of publication. *Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 858 (Tex. 2005). However, applying the same technique to determine whether a particular publication is "of and concerning" the plaintiff—when the focus remains on whether the specific publication is defamatory at all—is novel. Rather, the Supreme Court has established that the specific publication cannot be "of and concerning" the plaintiff if it does not "make even an oblique reference to [the plaintiff] as an individual." *Sullivan*, 376 U.S. at 289.

Although we recognize that defamation claims should be reviewed in context, our concern is where the inquiry would stop under Penick's analysis. Penick is a public figure who is likely to be mentioned frequently by the media. The rule cannot be that a newspaper's individual reference to a public figure in an article published months earlier could be used to transform a subsequent article, which never mentions the public figure, into one that is "of and concerning" him.[7]

---

[7] Although not controlling, we find *Early v. Toledo Blade*, 720 N.E.2d 107 (Ohio Ct. App. 1998), instructive because of its factual similarities to this case. There, the *Toledo Blade* ran a multi-part editorial series investigating the internal affairs of the local police department. *Id*. at 113-14. Several police officers sued for defamation, and the trial court granted summary judgment in favor of the *Toledo Blade*. *Id*. at 114. The appellate court held that statements about "drug and alcohol abuse by public servants, misplaced values, and the corruption of our systems, . . . alcohol cases where officers were carrying guns, . . . [and] neglect of duty cases" were not actionable because they were "not 'of and concerning' any one individual." *Id*. at 121-22. Further, regarding one particular plaintiff, the court held that a subsequent publication several days later specifically

14

Rather, the test requires us to determine whether a person would understand the individual publication at issue to implicate Penick. *See Newspapers*, 339 S.W.2d at 289-290.

Here, the October 18 article does not make even an oblique reference to Penick, either as an individual or in his capacity as the District Attorney. *See Sullivan*, 376 U.S. at 289. Accordingly, Penick has failed to produce any evidence to demonstrate that the October 18 article was "of and concerning" him. The district court, therefore, erred in denying appellants' summary judgment motion as to this article. We sustain appellants' first issue.

With regard to the remaining publications—the December 13 and January 3 articles and the December 20 letter to the editor—we turn to appellants' third issue because the lack of evidence of actual malice is dispositive.

**Actual Malice**

The Texas Supreme Court has articulated standards for analyzing the existence of actual malice in public figure defamation cases against media defendants. *See, e.g.*, *Cantu*, 168 S.W.3d at 849 (media defendants entitled to summary judgment on public figure's defamation claim because no evidence of actual malice); *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 639 (Tex. 2005) (same); *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 168 (Tex. 2004) (same); *Huckabee*, 19 S.W.3d at 417 (same). To establish defamation, a public figure plaintiff carries the burden to prove that the

---

naming that plaintiff did not turn the prior article into one "of and concerning" that plaintiff. *Id*. at 122. Moreover, regarding each of the defamation plaintiffs, the appellate court considered the multiple publications collectively to determine whether they were of a defamatory character and published with actual malice, but declined to consider them collectively in determining whether any article in particular was of and concerning the plaintiffs. *See generally id*. at 123-35.

15

defendant published the statements with actual malice. *Skeen*, 159 S.W.3d at 637 n.1; *Huckabee*, 19 S.W.3d at 420. The purpose of requiring public figures to overcome this high burden is to protect uninhibited debate on public issues. *Isaacks*, 146 S.W.3d at 161-62, 165.

At the summary judgment stage, the media defendant can negate that it acted with actual malice, as a matter of law, by proving that it did not publish the articles at issue with knowledge of falsity or a reckless disregard for the truth. *Cantu*, 168 S.W.3d at 853; *Huckabee*, 19 S.W.3d at 420. Actual malice has been described as "calculated falsehood." *Isaacks*, 146 S.W.3d at 162. Whereas "knowledge of falsity is a relatively clear standard, [] reckless disregard is . . . a subjective standard" that, to be disproved, requires evidence that the media defendant did not entertain any serious doubts about the truth of the article at the time it was published. *Skeen*, 159 S.W.3d at 637.

The defendant can establish such proof through the submission of affidavits, so long as they are "clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." Tex. R. Civ. P. 166a(c); *Isaacks*, 146 S.W.3d at 163-64. "In actual malice cases, such affidavits must establish the defendant's belief in the challenged statements' truth and provide a plausible basis for this belief." *Huckabee*, 19 S.W.3d at 424. Such affidavits will not be deemed "conclusory" if they "provide [a] detailed explanation of the affiants' state of mind and descriptions of the steps taken to ensure that the article [was not published with knowledge of falsity or with a reckless disregard for the truth]." *See Isaacks*, 146 S.W.3d at 165.

16

Once the defendant produces some evidence that it did not act with actual malice, the burden shifts to the plaintiff to produce evidence of the contrary. *Cantu,* 168 S.W.3d at 853; *Huckabee*, 19 S.W.3d at 420. At this stage, we assume all facts favorable to the nonmovant are true and draw all reasonable inferences in its favor. *Huckabee,* 19 S.W.3d at 424. If the plaintiff fails to produce a scintilla of evidence to create a genuine issue of material fact about the existence of actual malice, then summary judgment is appropriate, pursuant to either a traditional or no-evidence analysis. *See* Tex. R. Civ. P. 166a(c), (i).[8]

Here, the appellants supported their motions for summary judgment with affidavits from Tyler, the author of the articles in question, and from Metta Johnson, the managing editor of the *Smithville Times* at the time of the disputed publications. Tyler averred that, in preparation for the series, she researched the police reports, medical examiner's report, trial transcripts, appeals, investigative reports of the Texas Rangers, and press articles from other publications. She also interviewed Reed's family, friends, attorneys, and private investigators. Tyler acknowledged that she solicited Fisher's viewpoint on the Reed case and stated that she trusted him based on his prior success investigating public officials. Tyler further averred that she had no contempt for Penick and, in fact, never mentioned Penick's name in her editorial series. Tyler stated in her affidavit that she believed all the facts represented in her articles to be true at the time of publication and, with the

---

[8] Although the United States Supreme Court has ruled that the clear and convincing standard of proof is required for actual malice in summary judgment cases under Federal Rule of Civil Procedure 56, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S .242, 255-57 (1986), the Texas Supreme Court has not adopted this view for summary judgment proceedings under Texas Rule of Civil Procedure 166a, *see Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 859 n.49 (Tex. 2005).

exception of the few non-material facts that Fisher corrected in his December 20 letter to the editor, she still believes them to be true.

Johnson's affidavit expresses that she believed the Reed case was an important news event in Bastrop County. According to her affidavit, Johnson assigned Tyler to report on a habeas corpus hearing in March 2001, but Tyler continued researching the Reed case on her own initiative. After Tyler explained to Johnson many of the inconsistencies that Tyler saw in the case and the reasons for her opinions, Johnson agreed that an editorial series would be appropriate because these inconsistencies "had not gotten much coverage during the Reed trial." Johnson averred that she did not have any animosity toward Penick and that, in her opinion, Penick was excluded from the editorial series because he was not relevant to the inconsistencies discovered by Tyler. Johnson further averred that, as editor, she published letters to the editor on both sides of the issue.[9] Additionally, Johnson's affidavit noted that the errors contained in Tyler's December 13 article were corrected by publishing Fisher's December 20 letter to the editor. Johnson believes that the editorial series expressed "honest opinions" about the Reed case and that the December 13 article "accurately recount[ed]" Fisher's allegations concerning Penick.

In their respective affidavits, both Tyler and Johnson aver that they believed the reports to be accurate at the time of publication, explain what their state of mind was at the time, and provide descriptions of why they had a reasonable belief in the truth of the articles. *Isaacks*, 146 S.W.3d at 165; *Huckabee*, 19 S.W.3d at 424. These affidavits satisfy appellants' initial burden on

---

[9] This is confirmed by the record, which includes letters to the editor appearing in the *Smithville Times* on September 20 and October 25 criticizing Tyler's editorial series and espousing views that Reed is guilty beyond a reasonable doubt.

18

negating actual malice as a matter of law in order to shift the burden to Penick to present evidence establishing a genuine issue of material fact about the existence of actual malice in this case. *Cantu*, 168 S.W.3d at 853.

Penick raises seven points that he believes support his assertion of actual malice: the appellants (1) failed to tell the reader that Travis County was not investigating Fisher's letter, (2) printed dubious information from a biased source, (3) hid from the reader the relationship between the *Smithville Times* and Fisher, (4) omitted complimentary statements about Penick from a candidate's campaign announcement published in the *Smithville Times*, (5) predicted future publications and events, (6) failed to talk to Penick, Tanner, or other members of the prosecution team, and (7) omitted and juxtaposed facts to create an overall false impression. We will address each in turn.

### *Failure to tell readers that Travis County was not investigating Fisher's letter*

Penick claims that, by not clarifying in the December 13 article, which was headlined "Fraud charges filed on DA in Reed case," that the Travis County District Attorney's office had not opened an "active investigation," the appellants published the article with actual malice. In support of this argument, Penick relies on the fact that Mary Farrington from the Public Integrity Unit of the Travis County District Attorney's office had informed the *Smithville Times* on November 14 or 15 that complaints similar to Fisher's were received frequently and that, at that time, no active investigation had been opened on the allegations filed by Fisher against Penick. Penick asserts that the truth of the December 13 article was grossly distorted by the omission of Farrington's November statement that no active investigation had been opened. We disagree.

19

A media defendant's "omission of facts may be actionable if it so distorts the [readers'] perception that they receive a substantially false impression of the event." *Huckabee*, 19 S.W.3d at 425. For a public figure to demonstrate that such an omission constitutes actual malice, however, he must present evidence that the defendant was aware that the omission could create a substantially false impression. *Id*. at 426 (plaintiff could satisfy test with evidence that defendant selectively omitted facts to purposefully create false portrayal of events). If the omission of certain facts does not grossly distort the story, then the defendant's "failure to capture accurately all the story's details suggests [only] an error in judgment, which is no evidence of actual malice." *Id*.

Penick presented no evidence that appellants were or should have been aware that the omission of Farrington's November comment from the December 13 article would create a substantially false impression of the relevant events. After Farrington spoke with the newspaper in November, Fisher amended his complaint on December 7, and the newspaper never received an updated report from Farrington about the status of the investigation following Fisher's amended filing. In the December 13 article, appellants reported that Fisher had filed the allegations (both the original and amended ones), without discussion as to whether the Public Integrity Unit was actively investigating them or not. Penick does not dispute the truth of the article's report that Fisher "filed a formal complaint" charging Penick and others with "conspiracy to commit fraud . . . in connection with the Rodney Reed case," and Penick acknowledges that, at the time of publication, these charges were still pending.

Moreover, Farrington swore in her deposition that she informed the newspaper only that "we [do] not have an open investigation at this time and [] we receive[] complaints all the time

from lots of different people."[10] She did not tell the newspaper that the complaint was baseless or frivolous, nor did she say that an investigation would never be opened. Indeed, in her deposition Farrington clarified that, "[the office] receives complaints from lots of different people, and we take those complaints, and we, of course, review them." Thus, appellants could have reasonably inferred at the time of publication that Fisher's complaint was still in some preliminary review stage, especially taking into account that Fisher had recently amended the complaint. The presumption that the investigation was still open at some level was substantially true because Farrington did not consider the matter closed until December 18 when she sent a letter stating such to Fisher.

The truth of the December 13 report (that Fisher had filed allegations against Penick) was not grossly distorted by appellants' omission of the fact that the pending complaint had not yet been actively investigated by the Travis County Public Integrity Unit. The omission of Farrington's November statement is not evidence of actual malice. *See Huckabee*, 19 S.W.3d at 425-26.

### *Publication of dubious information from a biased source*

Next, Penick claims that actual malice is demonstrated by the fact that appellants printed "dubious information" obtained from a "biased source"—*i.e.*, Fisher. Yet, Penick offers no evidence to support this claim. Evidence that a media defendant's "report was mistaken, even if negligently so, is no evidence of actual malice" unless the plaintiff presents evidence that the defendant purposefully published mistaken facts or that the circumstances were "so improbable that only a reckless publisher would have made the mistake." *Cantu*, 168 S.W.3d at 855. "An

---

[10] The wording of Farrington's phone call is not disputed. Both parties rely upon Farrington's recollection of her words in her deposition.

understandable misinterpretation of ambiguous facts does not show actual malice." *Id*. As long as the article presents a "rational interpretation" of the actual events, the article standing alone will not establish actual malice. *Id*. at 857. Likewise, a media defendant's failure to fully investigate does not constitute actual malice, although its purposeful avoidance of the truth does. *Skeen*, 159 S.W.3d at 637. In addition, evidence that an article was written "from a particular point of view, even when [the article is] hard-hitting or sensationalistic, is no evidence of actual malice." *Huckabee*, 19 S.W.3d at 425.

Penick fails to present evidence that appellants acted recklessly or purposefully avoided the truth in relying on Fisher as a source. Penick relies primarily on a statement by Davis McAuley, editor of *The Bastrop Advertiser*, that he believed Fisher was untrustworthy. Even assuming that someone else regarded Fisher as an outlandish conspiracy theorist, evidence of another person's opinion, who has no connection to the instant case, is not evidence (1) that Fisher was so untrustworthy that it would be reckless for anyone to believe him or (2) that appellants were aware of Fisher's lack of trustworthiness and chose to ignore it or purposefully avoided the truth. Thus, it is not evidence of actual malice on behalf of appellants. *See St. Amant v. Thompson*, 390 U.S. 727, 733 (1968) (although defendant reported some mistaken information provided by source, failure to investigate source's credibility was not evidence of reckless publication; record failed to demonstrate "a low community assessment of [source's] trustworthiness"); *Beck v. Lone Star Broad. Co.*, 970 S.W.2d 610, 617 (Tex. App.—Tyler 1998, pet. denied) ("failure of a defendant to fully investigate . . . the credibility of a source does constitute actual malice").

22

Similarly, even assuming the publications were authored from a hard-hitting conspiracy theorist's perspective, this too provides no evidence of actual malice. *See Huckabee*, 19 S.W.3d at 425; *New Times, Inc. v. Wamstad*, 106 S.W.3d 916, 928 (Tex. App.—Dallas 2003, pet. denied) ("reporter may rely on statements by a single source, even though they reflect only one side of the story, without manifesting a reckless disregard for the truth"). Evidence of Fisher's prior investigations into other alleged conspiracies is also not evidence that Fisher provided unreliable information to appellants concerning the Reed case or that appellants were aware the information was unreliable. There is simply no evidence in this record that would allow a reasonable fact-finder to conclude that, in using Fisher as a source, appellants acted with actual malice, whether consciously or recklessly.

Finally, it is not disputed that Tyler did not blindly rely on Fisher's investigation. According to Tyler's and Johnson's deposition testimony, they concluded that, based on their review of the trial evidence, reasonable doubt existed about Reed's guilt. Fisher's deposition reflects that he formed the same conclusion from his independent investigation. While Tyler and Johnson could have done more investigating, there is no evidence that they "purposefully avoided the truth" and no evidence that only a reckless publisher would have published the information they reported. *See Skeen*, 159 S.W.3d at 637 (reporter's five months of research, including interviews and reading court records, coupled with absence of source that could have easily disproved statements showed no purposeful avoidance of the truth to constitute actual malice in reporter's criticisms of district attorney's office); s*ee also Cantu*, 168 S.W.3d at 855.

23

*Failure to disclose relationship between the* **Smithville Times** *and Fisher*

In support of his claim of actual malice, Penick argues that the *Smithville Times* hid the fact that Tyler asked Fisher to investigate the case in order to use Fisher's independent assessment as corroboration for Tyler's own theories. This argument is without merit for two reasons. First, Penick has failed to demonstrate that appellants "hid" this relationship from the readers. To the contrary, the newspaper published Fisher's August 23 letter to the editor stating that he had been asked by a reporter to investigate the Reed case.[11] Second, even taking as true Penick's claim that appellants "hid" the fact that Fisher aided in the investigation, this is no evidence of actual malice because journalists are not required to reveal every source of information upon which they have relied. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 123 (Tex. 2000). Because appellants' use of Fisher as a source was not reckless, regardless of whether this relationship was revealed or kept confidential, it does not demonstrate that the articles were published with knowledge of falsity or a reckless disregard for the truth.

These facts are akin to the ones found in *Turner*. *Id*. There, the media defendant failed to reveal that one of its sources for a news story, which implicated a mayoral candidate in a possible insurance fraud scandal, was a member of the opposing campaign. There was evidence that the defendant knew of the source's affiliation. *Id.* However, the court ruled that the defendant's failure to reveal its source was not clear and convincing evidence of actual malice because (1) the plaintiff failed to produce sufficient evidence that the media defendant intended to endorse the opposing candidate, and (2) the defendant may have believed in the truth of the story. *Id.* Similarly,

---

[11] *See supra* footnote 5.

Penick's claim that appellants "hid" the fact that Fisher was a source provides no evidence that appellants had serious concerns about the veracity of the publication.[12]

### *Omission of complimentary statements about Penick*

Penick argues that actual malice is demonstrated by the fact that, on September 13, 2001, when the Smithville Times reported that Bryan Goertz had announced his candidacy for District Attorney, appellants failed to include complimentary statements made in Goertz's campaign announcement about Penick. We disagree.

The September 13 story is solely about Goertz's candidacy: his background, qualifications, and reasons for seeking office. The only mention of Penick in the article is that "[t]he position is currently being held by veteran prosecutor Charles Penick, who previously announced that after 25 years in office, he will not be seeking re-election." Penick does not allege that any information in this statement is false and/or that it was damaging to his character or reputation. The newspaper had discretion to edit its story to cover only the relevant facts about the current candidate and to omit the candidate's favorable statements about the incumbent. Such an omission by appellants provides no evidence of actual malice toward Penick. *See Turner*, 38 S.W.3d at 122-23 (Tex. 2000) (journalist entitled to edit story as necessary, and omission of favorable comments about plaintiff, when remainder of report is not otherwise false, is not evidence of actual malice); *HBO v. Harrison*, 983 S.W.2d 31, 42 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (quoting

---

[12] We recognize that *Turner* involved a clear and convincing standard that is higher than the level of evidence required in the case at hand, but we find the analysis persuasive.

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)) (editorial choice to exclude favorable comments about public figure in otherwise truthful report is not actual malice).

Moreover, appellants had previously published favorable statements about Penick. On August 16, Johnson authored a report about Penick's decision to not seek re-election, which included Penick's quote that, "I have enjoyed the 24 years I have spent representing the people of Bastrop County; however, it is now time to move on to new endeavors. I am proud of the work my professional staff has accomplished. I want to thank all of the voters and friends that have supported me in past elections and wish only the best to my successor."

A news organization cannot be required to print or air the viewpoint of everyone who might speak on a public figure's behalf. *Turner*, 38 S.W.3d at 122. Also, there is no evidence that the omission of these favorable statements grossly distorted the articles at issue or created a substantially false impression of Penick. *See Huckabee*, 19 S.W.3d at 425-26 (because omission of facts that more clearly explained plaintiff's judicial decisions did not grossly distort story, it was not evidence of actual malice). Hence, appellants' omission of Goertz's favorable statements about Penick provides no evidence of actual malice. *See Cantu*, 168 S.W.3d at 858.

### *Prediction of future publications and events*

Penick's fifth argument for actual malice is based on his claim that the *Smithville Times* had predetermined to publish the December 13 article headlined "Fraud charges filed on DA" article, regardless of whether the story turned out to be true or false, because Tyler had previously stated in an October 18 editorial that the Attorney General's office had launched an investigation. Like Penick's first actual malice argument, this claim hinges on whether the allegations filed by

26

Fisher were being "actively investigated." In other words, Penick asserts that actual malice is demonstrated because Tyler reported that an investigation had been launched before actually finding out whether Fisher's allegations of fraud would be investigated.

Penick cites *Harte-Hanks Communications, Inc. v. Connaughton* as support. 491 U.S. 657, 684 (1989). In *Harte-Hanks*, a newspaper editorial predicted the discovery of information damaging the integrity of candidates for municipal judge before publishing allegations about one of the candidates a few days later. *Id.* Subsequent interviews all contradicted the allegations, yet the newspaper chose to publish the allegations as predicted. *Id.* at 683. The United States Supreme Court held that this demonstrated a reckless disregard for the truth. *Id.* at 684. Penick argues that, like the defendants in *Harte-Hanks*, appellants acted with actual malice by publishing the December 13 article based on a predetermined decision regardless of the article's truth.

However, Penick cannot show that the primary contents of the December 13 article were false. Other than the three misstated errors, which were minor and were corrected by Fisher's December 20 letter to the editor, the December 13 article accurately reported that the allegations had been filed by Fisher and were pending. Thus, this provides no evidence of actual malice. *See Grotti*, 188 S.W.3d at 775 ("to prove substantial truth, the defendants need only prove that the third party allegations were in fact made and accurately reported and that the allegations were under investigation").

*Failure to talk to Penick, Tanner, or other prosecutorial members*

Penick argues that the *Smithville Times* and Tyler acted with actual malice because they intentionally avoided the truth by failing to interview Penick and others on the prosecution side of the Reed case. Although the failure of a newspaper to fully investigate allegations before publishing them will not alone support a finding of actual malice, purposeful avoidance of the truth will. *Harte-Hanks*, 491 U.S. at 692. Evidence of a media defendant's knowledge that a public figure plaintiff has denied harmful allegations or offered an alternative explanation of events is not evidence that the defendant doubted the allegations for purposes of establishing actual malice, because "[i]n the world of politics, 'such denials are so commonplace [that] . . . they hardly alert the conscientious reporter to the likelihood of error.'" *Cantu*, 168 S.W.3d at 858; *see also Harte-Hanks*, 491 U.S. at 692 n.37; *Skeen*, 158 S.W.3d at 639; *Hucakbee*, 19 S.W.3d at 427. Also, a news organization is not required to publish the interviews of everyone who might speak on a public figure's behalf. *See Turner*, 38 S.W.3d at 122. While a media defendant may purposefully avoid the truth by failing to investigate obviously crucial and reliable sources of information, the law is clear that the public figures themselves need not be interviewed due to their personal bias and the likelihood of a denial. *See Harte-Hanks*, 491 U.S. at 692 n.37; *Cantu*, 168 S.W.3d at 858; *Skeen*, 158 S.W.3d at 639; *Huckabee*, 19 S.W.3d at 427.

As support for his position, Penick cites *Bentley v. Bunton,* 94 S.W.3d at 602. In *Bentley*, the court ruled that the defendant had displayed actual malice by hounding a public figure relentlessly for months with ruthless corruption accusations on television, while privately expressing doubts about the charges, and by "deliberately ignor[ing] people who could have answered all his

28

questions." *Id.* The instant case is distinguishable, however, because the defendant in *Bentley* went beyond the mere failure to consult with the plaintiff or investigate other sources; he broadcast severe accusations about which he had privately expressed serious doubt. *Id.* Thus, in *Bentley*, the defendant's actions fell squarely within the definition of "reckless disregard" because the defendant had expressed doubt for the veracity of his defamatory claims and had ignored obvious and unbiased sources of information as a means of purposefully avoiding the truth. *Id.* at 590, 602.

In the case at hand, Tyler expressed no such doubt about the veracity of her accusations. Tyler interviewed defense attorneys and investigators to determine what practices or procedures in the Reed case were inconsistent with a proper investigation. She researched the public record on the Reed case. She viewed crime scene reports, pictures, and videotapes reflecting the views of the law enforcement officers involved in the original investigation. She read the trial and hearing transcripts displaying the arguments and theories of the prosecution. Although Tyler did not seek the comments of those she accused of prosecuting a flawed case against an innocent man, she was not required to do so. *See El Paso Times v. Trexler*, 447 S.W.2d 403, 406 (Tex. 1969) (even "[negligence] or failure to act as a reasonably prudent man [in investigating a story] is [] insufficient" to establish actual malice); *Cloud v. McKinney*, No. 03-04-00656-CV, 2006 Tex. App. LEXIS 7658, at *28-29) (Tex. App.—Austin Aug. 30, 2006, no pet.) (opinion) (Spokeswoman's failure "to check [facts] with McKinney or Cloud prior to making the statements does not mean that [spokeswoman] made the statement knowing that it was false or with reckless disregard as to the truth or the statement."). The fact that Tyler had done enough research to have a reasonable belief in her

viewpoint is sufficient to disprove a reckless disregard for the truth. *Trexler*, 447 S.W.3d at 406; *see also Fort Worth Star-Tele. v. Street*, 61 S.W.3d 704, 713 (Tex. App.—Fort Worth 2001, pet. denied).

Tyler's actions are also unlike the defendant's actions in *Harte-Hanks*, which the Supreme Court deemed to involve actual malice. *See* 491 U.S. at 692. There, the Court held that the defendant purposefully avoided the truth by publishing accusations against a mayoral candidate when the defendant was aware of tape-recordings by other witnesses that clearly showed the accusations to be false. The Court held that the defendant's choice to ignore the tapes was likely "a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the grand juror's] charges." *Id*. Penick presented no evidence that Tyler had received significant information contrary to her theories or that there was some clear way she may have verified the truth of her claims.

Penick produced no evidence showing that Tyler doubted the veracity of her claims, as did the defendant in *Bentley*, 94 S.W.3d at 590, 602, or that Tyler purposefully avoided the truth, as did the defendant in *Harte-Hanks*, 491 U.S. at 692. Thus, Tyler's failure to interview Penick and other prosecutors is not evidence of actual malice.

### *Modification of facts to create a false impression*

In his final actual malice argument, Penick alleges that the "gist" of the defamatory articles as a whole conveyed a false impression to the readers, which he argues was "so glaring as to serve as proof of malice." *See Turner*, 38 S.W.3d at 116; *see also Huckabee*, 19 S.W.3d at 426. As support, Penick lists several facts that he claims were either improperly omitted from or juxtaposed within appellants' publications. However, whether or not the "gist" of the articles could

30

be proven to be false, actual malice requires evidence that appellants knew of or recklessly disregarded the false impression created by the articles. *See Huckabee*, 19 S.W.3d at 426.

Penick cites *Huckabee v. Time Warner Entertainment* as support for the idea that "glaring" falsehoods are stand-alone evidence of actual malice. *Id.* *Huckabee* provided a single example of a case where the omission of facts may be stand-alone evidence of actual malice. *Id.* at 426 (citing *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1092 (3rd Cir. 1988)). In *Schiavone*, the Third Circuit ruled that a newspaper's omission of exculpatory statements from a story reporting about an FBI memorandum that linked the plaintiff to the disappearance of Jimmy Hoffa was evidence of actual malice because four unbiased FBI sources corroborated the statements to the newspaper before publication, and the omission so changed the character of the story that the defendant likely knew or suspected that it would convey a false impression. *Schiavone Constr.*, 847 F.2d at 1092.

Although the court in *Huckabee* acknowledged that in some cases an omission of fact could be proof of actual malice, it did not go so far as to say that all omissions of fact would serve as evidence of actual malice. *Huckabee*, 19 S.W.3d at 426. In fact, the court in *Huckabee* held that the defendant's omission of facts, which would have made the plaintiff's judicial decisions appear less arbitrary, was not evidence of actual malice without additional evidence that the defendant omitted the facts with knowledge that it may convey a substantially false impression. *Id.* *Huckabee* set the bar high to protect a media defendant's choice of what material to include in its broadcasts. "Although the facts omitted might or might not have led a reasonable viewer to suspend judgment or even to reach an opposite conclusion regarding [the plaintiff], their omission did not grossly distort the story" and, thus, was not stand-alone proof of actual malice. *Id.* Here, there is no

31

evidence that appellants knew or should have known that their choice of published facts would convey a substantially false impression or grossly distort the truth of the story to a reasonable reader.

In his seven arguments, Penick fails as a matter of law to raise a genuine issue of material fact regarding actual malice.

## CONCLUSION

The district court erred by denying the appellants' motion for summary judgment regarding the October 18 article because the article was not "of and concerning" Penick. Furthermore, the district court erred by denying the appellants' motion regarding the October 18, December 13 and 20, and January 3 articles because Penick failed to present a scintilla of evidence to demonstrate that any of these articles was published with actual malice.

Accordingly, we reverse the portion of the district court's order that denied summary judgment for the appellants regarding these four articles, and we render a take-nothing judgment in favor of appellants on Penick's claims related to these four articles.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Reversed and Rendered

Filed:   February 13, 2007

32