TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00495-CV






Byron D. Neely, Individually and Byron D. Neely, M.D., P.A., Appellants


v.


Nanci Wilson; CBS Stations Group of Texas, L.P., d/b/a KEYE-TV; and Viacom, Inc.,
Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT

NO. D-1-GN-04-001858, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING






O P I N I O N


 Following an Austin television station's broadcast of an "investigative" news report
that negatively portrayed his work as a neurosurgeon, Dr. Byron Neely and the professional
association through which he practiced, Byron D. Neely, P.A. (collectively "Neely," except when
the distinction is relevant), asserted causes of action for libel against the reporter who had written
and presented the story, Nanci Wilson; the television station, CBS Stations Group of Texas, L.P.
d/b/a KEYE-TV ("KEYE"); and KEYE's owner, Viacom, Inc. The defendants moved for and
obtained summary judgment as to each of Neely's claims. Neely appeals. For the reasons explained
herein, we will affirm the district court's judgment.




FACTUAL AND PROCEDURAL BACKGROUND

 The facts summarized below are taken from the summary-judgment evidence,
presented in the light most favorable to Neely, the non-movant.

 As of the time of the broadcast in question, Neely was a board-certified neurosurgeon
who had maintained a private practice in Austin for more than twenty-five years. At relevant times,
Neely had privileges at Austin's St. David's Hospital. By the time the broadcast aired, Neely had
performed over four thousand surgeries. Of these, seven had given rise to medical-malpractice suits
in which Neely was named as a defendant. All of the suits had been predicated on alleged acts
occurring in 1994 or after, and at least four had arisen in 1999 or later. In four of the suits, the
claims against Dr. Neely had been settled. In one suit, the claims against Dr. Neely had been non-suited "with prejudice." In the remaining two cases, both of which had been filed by pro se
plaintiffs, the claims against Dr. Neely had been involuntarily dismissed.

 As we will detail below, the broadcast stated that Neely had been sued four times but
explored the subject matter of only two of these actions. The first, brought by former patient
Paul Jetton and his then-wife, Sheila, on behalf of themselves and their three children, alleged that
Neely, another neurosurgeon, and St. David's Hospital had been negligent in providing medical care
to Paul in September 1999. (1) Paul had been referred to Neely by another physician after an MRI
had detected a small mass in his midbrain. Neely diagnosed Paul as having a lesion in his brain and
secondary hydrocephalus (a build-up of fluid on the brain). Neely performed surgery to insert a
shunt to draw fluid from Paul's brain, utilizing a "Torkildsen shunt" procedure, which entailed
inserting the shunt near the base of Paul's brain. The surgical team encountered difficulties that
included challenges in positioning Paul--a former University of Texas and NFL lineman who stood
6' 4" and still weighed almost 300 pounds--and the procedure ultimately lasted almost eight hours.
While Paul was hospitalized after surgery, he developed an enterobacterial infection. Neely
recommended removing the shunt, but Paul, at Sheila's insistence, chose to follow the advice of an
infectious disease doctor who recommended discharging Paul and treating the infection at home
with antibiotics. Reluctantly, Neely approved Paul's discharge from the hospital, although he did
not indicate "AMA" (against medical advice) in Paul's medical records. After discharge, Paul
developed serious complications from the infection, including a brain abscess, meningitis, and syrinx
(accumulation of fluid in the spinal cord). Paul returned to the hospital where Neely removed the
shunt. As of the time of the broadcast, Paul had undergone as many as twelve additional brain
surgeries and was physically disabled, requiring aid of a walker to walk.

 In their suit, the Jettons alleged that Neely had been negligent in performing surgery
to insert a shunt to drain fluid without proper indications for such surgery, in opting to utilize the
Torkildsen shunt procedure, in performing the procedure improperly, in allowing the surgical site
to get infected, in positioning Paul in a way that caused permanent damage to his ulnar nerve, and
in failing to remove Paul's infected shunt before discharging him. Additionally, the Jettons alleged
that when providing medical care to Paul, Neely had been impaired by dependency on steroids and
opiates and had hand tremors attributable to the medications he was allegedly taking.

 Over the years, Neely had suffered from a variety of ailments and injuries--including
severe asthma and allergies, spastic colon, and a torn rotator cuff--for which other physicians had
prescribed him pain-killers, muscle relaxants, and other medications. These medications included
steroids, narcotics, and opiates. By 1999, it is undisputed that Neely had begun self-prescribing
refills of many of these medications. Neely asserted that this was a common practice among
physicians and one that at the time was not explicitly prohibited by any law. While Neely
acknowledged that some of these medications were capable of impairing his medical competence,
he steadfastly maintained that he never used them at times or in amounts that actually did impair
him. After discovery uncovered information regarding Neely's use of these medications, the Jettons
alleged otherwise.

 Relatedly, Neely acknowledged that he suffered from hand tremors beginning in 1999
that several other individuals, including Sheila Jetton, had witnessed. He attributed the tremors to
his "tapering" of his dosage of a steroid allergy medication that he had taken for decades. Neely
claimed that he could predict when the tremors would occur and that he could "control" them by
"holding [his] hands down on the patient."

 In June 2003, the Jettons' claims against Neely were settled for $500,000--the limits
of Neely's professional liability insurance policy. Neely did not admit liability, but settled the claims
because of Paul Jetton's "high profile status" as a former Texas Longhorn and NFL player and the
"sympathetic nature of his injuries."

 Along with their suit, the Jettons filed a complaint against Neely with the
Texas Board of Medical Examiners (now the Texas Medical Board) ("the Board") regarding his
medical care of Paul. The Board dismissed the complaint in June 2003 after finding no violations
of the medical practice act. Although the district court excluded from evidence a letter from the
Board informing Neely of its disposition of the complaint, the broadcast, which was in evidence,
noted that the Board had found "no wrong doing" in Neely's care of Paul.

 The second suit discussed in the broadcast had been brought by Li Yu, the ex-wife
of a former Neely patient, Wei Wu. In November 1999, Neely had performed surgery on Wu to
remove a brain tumor. A biopsy of the tumor revealed it to be a malignant metastatic melanoma
(skin cancer that had spread to his brain). Neely also determined, upon visual inspection
during surgery, that the cancer had spread to numerous other sites throughout Wu's brain. Based on
the surgery results and the pathology report, Wu's oncologist informed Wu that, all other things
being equal, he would probably have a short time to live and recommended that he be evaluated
at M.D. Anderson for experimental melanoma treatments. Several days later, Wu, a TxDOT
engineer, committed suicide by jumping from the U.S. 183 overpass over MoPac in Austin. The
Travis County Medical Examiner's office conducted an autopsy and concluded that, contrary to the
diagnosis Wu had been given, Wu's brain following surgery showed "no residual metastatic
melanoma on gross inspection."

 Yu, acting pro se, sued Neely, the oncologist, and St. David's for medical
malpractice, alleging, in part, that Neely and the oncologist misdiagnosed Wu as having cancer
throughout his brain when, in fact, he did not. This and other actions, Yu further alleged, contributed
to Wu's suicide. In a separate proceeding, Yu also sued various TxDOT personnel for allegedly
causing Wu's suicide through their mistreatment of him. Although pro se and no longer married
to Wu, Yu purported to sue on behalf of Wu's estate and a minor child of their marriage. The
district court dismissed Yu's suit in part because Yu was not a licensed attorney and thus could
not act as counsel for the estate and the child. A complaint was also filed with the Board, but it
was dismissed after the Board found that Neely had not violated the medical practice act. The
district court excluded from evidence a letter from the Board advising Neely that it had found
no violations.

 The broadcast also discussed a 2003 disciplinary action that the Board had taken
against Neely on a 2002 complaint that he had been prescribing controlled substances to himself
that had the potential to interfere with his ability to perform surgery. (2) The Board investigated the
complaint and, on December 12, 2003, Neely and the Board entered into an agreed order in which
Neely, "[t]o avoid further investigations, hearings, and the expense and inconvenience of litigation,"
accepted a three-year probated suspension of his medical license along with other terms and
conditions. Of significance to this case, the agreed fact findings set forth in the order included:


6. Respondent suffered various injuries and ailments, which required a variety
of medications. Respondent's treating physician legitimately and
appropriately prescribed a number of medications to treat these conditions. 
However, between 1999 and 2002, Respondent began to refill the
medications himself in lieu of scheduled visits. The list of medications
Respondent has self-prescribed include Hydrocodone, Soma, Darvocet,
Paregoric, Propoxyphene, Carisoprodol, Medrol, Phenergan, Azmacort,
Cardura, Prilosec, Lomotil, Ventolin, Norco, and Flonase.


7. Upon review of statements of Respondent and the September 27, 2000
medical records of Respondent obtained from his treating physician, the
Panel of [Board representatives] concluded that Respondent had a prior
history of tremors.


8. The Panel took notice of the fact that the Board's investigator claims to have
witnessed a tremor during the 2002 interview. Respondent asserted the
tremor was the result of nervousness about the interview. 



The order also included findings that Neely had presented evidence that he had undergone a full
physical examination by a board-certified family practitioner, who found him to be in "relatively
good health, with no need of chronic medications," and "did not detect a medically significant
tremor," but "felt unqualified to determine" Neely's ability to perform surgery. Neely had also relied
upon the examination of a board-certified psychiatrist and addictionologist to determine the
possibility of substance abuse or addiction, who "found no underlying psychiatric condition that
would inhibit Respondent's ability to practice medicine." However, the findings reflected, "[t]he
Board is requesting independent physical and psychiatric evaluations to determine Respondent's
capacity to practice medicine in general, and specifically, to perform surgery."

 Based on these findings, the order concluded that Neely was subject to Board
discipline under sections 164.051(a)(4) and 164.056 of the occupations code "due to Respondent's
inability to practice medicine with reasonable care and safety to patients, due to mental or
physical condition." Section 164.051 authorizes the Board to take disciplinary action against a
doctor under various circumstances, and the order's language tracks the circumstances stated in
subsection (a)(4)(D) of section 164.051. See Tex. Occ. Code Ann. § 164.051(a)(4)(D) (West 2004). (3) 
Section 164.056 empowers the Board, when enforcing section 164.051(a)(4), to compel physical or
mental examinations by physicians designated by the Board. See id. § 164.056 (West Supp. 2009).
The order further concluded that Neely was subject to disciplinary action under section 164.051(a)(3)
of the code, see id. § 164.051(a)(3) (committing or attempting to commit a direct or indirect violation
of a Board rule), with regard to Board Rule 190.1(c)(1)(M), which was identified as "inappropriate
prescription of dangerous drugs or controlled substances to oneself, family members, or others in
which there is a close personal relationship."

 The Board suspended Neely's medical license but stayed the suspension and
placed Neely on probation for three years. Additionally, the order prohibited Neely from serving as
a physician for his immediate family members or prescribing, dispensing, administering, or
authorizing "controlled substances or dangerous drugs with addictive potential or potential for
abuse" to himself or his immediate family. The order further required Neely to be examined by a
Board-approved physician and evaluated by a Board-appointed psychiatrist who was board certified
in forensic or addictive psychology. If it was determined by the physician that Neely had a
medical condition that, without adequate treatment, could adversely affect Neely's ability to practice
medicine safely, Neely was required to undergo continuing care and treatment for such condition.
Similarly, if the evaluating psychiatrist recommended, Neely was to submit to continuing psychiatric
care and treatment by a psychiatrist approved by the Board. 

 Later in December 2003, the Board published a press release announcing that it
had taken public disciplinary actions against sixty-one doctors, including Dr. Neely. Subsequently,
the Austin American Statesman published an article on December 20, 2003, with the headline,
"6 physicians disciplined for substance abuse." The article reported that "The Texas board that
polices doctors recently disciplined six Austin physicians for violations involving either drug
or alcohol abuse." While the article focused primarily on another physician whose license had
been suspended by the Board, it mentioned, in bullet points at the end, each of the five other
Austin physicians who had been disciplined. Regarding Dr. Neely, the Statesman reported that
the Board:


Put Dr. Byron Davis Neely, a neurosurgeon, on probation for three years for self-prescribing medications, according to board records. The order prohibits him from
prescribing drugs to himself or his immediate family and includes requirements for
a psychiatric evaluation and board monitoring. Neely did not return a call to his
office.



Similarly, the Board placed the following statement in its online profile of Dr. Neely on its website:


ON 12-12-03 THE BOARD AND DR. NEELY ENTERED INTO AN AGREED
ORDER SUSPENDING THE PHYSICIAN'S LICENSE; STAYING THE
SUSPENSION, AND PLACING THE PHYSICIAN ON PROBATION FOR
THREE YEARS. THIS ACTION WAS BASED ON ALLEGATIONS THAT
DR. NEELY HAD SELF-PRESCRIBED MEDICATIONS WITH THE
POTENTIAL TO INTERFERE WITH HIS ABILITY TO PERFORM SURGERY.
THE TERMS OF THE ORDER FORBID DR. NEELY FROM
SELF-PRESCRIBING MEDICATIONS, AND REQUIRE CONTINUING
PHYSICAL AND PSYCHIATRIC EVALUATIONS TO VERIFY HIS FITNESS TO
PERFORM SURGERY. 



 The Statesman article attracted the attention of appellee Wilson, who at the time
was a television news reporter for KEYE. Wilson's role with KEYE was focused on researching,
writing, and presenting periodic "KEYE Investigates" reports during the station's newscasts. Wilson
began researching issues related to the Board and its disciplinary measures against doctors. She
compiled background information that included issue advocacy from the debates earlier in 2003
regarding legislative and constitutional measures to limit medical-malpractice lawsuits in Texas.
During those often-heated debates, opponents of the measures had argued in part that the
Board's disciplinary apparatus at the time was an ineffective alternative to the tort system in
eliminating unsafe doctors and ensuring patient safety. (4) Wilson also compiled information about
the specific disciplinary proceedings referenced in the December notice, including Neely's, which
led her to the statement in his online Board profile and the agreed order. She also researched court
filings, which led her to the Jettons' counsel and interviews with the Jettons, Yu, and a close friend
of Wu's, Peter Gao.

 Wilson taped on-camera interviews with the Jettons (in their home, with their
three young children present), Gao, and a spokesperson for the Board, Jill Wiggins. Wilson also
interviewed a physician representative from St. David's, Steve Berkowitz, M.D., questioning him
about the hospital's peer review processes. Wilson also made several attempts to contact Neely. Out
of what Neely claims was fear of saying anything that might antagonize the Board and perceiving
that the report would be biased anyway, Neely declined to be interviewed for the broadcast.
However, Neely's medical-malpractice counsel and his counsel in the Board proceedings both spoke
to Wilson and supplied her with materials and information favorable to Neely.

 Drawing on her research, interviews, and video footage, Wilson ultimately prepared
an investigative report that discussed Dr. Neely, some of his medical-malpractice suits, and
the Board's disciplinary action. The report was broadcast during the station's evening newscast on
Monday, January 19, 2004. The report consisted of edited excerpts from Wilson's taped on-camera
interviews with the Jettons, Gao, the Board's Wiggins, and St. David's Berkowitz; Wilson's
own narratives and visuals of such things as the Board's order, the pleadings in Neely's medical-malpractice suits, and Wu's autopsy report (including highlighting and enlargement of certain
excerpts); footage of Paul Jetton struggling to rise from a chair and walk with aid of a walker;
a graphic of Dr. Neely's name; and footage of Neely's place of business featuring a sign, "Byron D.
Neely, P.A." Also, while Dr. Neely was not interviewed, Wilson included an excerpt from a
videotaped deposition of him.

 The appellate record includes a DVD of the original broadcast. A complete transcript
of the audio portion of the broadcast follows:


 Fred Cantu (Anchor): If you were told you needed surgery would you want to
know if your surgeon had been disciplined for prescribing himself and taking
dangerous drugs, had a history of hand tremors and had been sued several times for
malpractice in the last few years?


 Judy Maggio (Anchor): A central Texas couple says they didn't learn about this
until it was too late. They're outraged the State Board of Medical Examiners is
allowing Dr. Byron Neely to continue to practice. KEYE news investigative reporter
Nanci Wilson tells us if you go to St. David's Hospital with a head injury you could
be Dr. Neely's next patient.


 Paul Jetton: I've been in, in and out of the hospital, you know, for the last four
years. Uh, I had twelve, I believe, I've even lost count, I believe twelve brain
surgeries, one spinal surgery.


 Wilson: This is Paul Jetton's life.


 Paul Jetton: I can't walk. You know, I still, I can walk with a walker, but I still
can't walk on my own.


 Wilson: Each step is a struggle, but it wasn't always this way. In 1982 Paul Jetton
was a linebacker for the University of Texas. He was so good he went on to play in
the pros. His first year with the Cincinnati Bengals the team went to the Super Bowl.
But in 1999 . . .


 Paul Jetton: I just wasn't feeling well. When I went, you know, for I just wanted
to get a physical.


 Wilson: Something unusual showed up on the MRI scan of his brain.


 Paul Jetton: He told me that I had this, this tumor in my brain and, and that I had
to, had to have it operated on.


 Wilson: His doctor, Austin neurosurgeon Byron Neely, who has been in practice
since 1977, said an operation would help.


 Paul Jetton: You know it would only be a two hour surgery and that I'd be in, I'd
only be in the hospital for two or three days and I'd go on with the rest of my life.


 Wilson: The two hour surgery stretched into almost eight hours and Paul was in
the hospital for six weeks. While in the hospital Paul developed an infection in his
brain. However, he was discharged from the hospital anyway. The result: numerous
surgeries and a life of disability. Paul's wife Sheila says what they learned from
other doctors was the final blow.


 Sheila Jetton: Every neurosurgeon that's looked at Paul's MRIs from before Neely
operated on him have said they would have never done surgery. They would have
watched him with MRIs over years.


 Wilson: The Jettons aren't the only patients to raise questions about Dr. Neely.
Wei Wu, a software engineer with two PhDs was referred to Dr. Neely. Neely
explains the case in this deposition from 2002.


 Dr. Neely: [From the video of his deposition] He came in very confused one day,
uh, was found to have a uh, very major brain tumor thought to be a meningioma at
the time because it, of the location in the brain. Uh, the patient was taken to the OR
thereafter and found to malignant melanoma [sic].


 Wilson: Peter Gao was a friend of Wei Wu's. Gao says Wu struggled with the
diagnosis that Wu had only a few months to live.


 Peter Gao: The doctor is more like persuasive say, well the doctor have seen when
he open, when he opened your skull, seen everywhere. So, all we need to do right
now I guess, is face, kind of like to face the music.


 Wilson: It may have been too much for Wei Wu to handle. A few days later Gao
found Wu's abandoned car near the 183 overpass at Mopac. Then discovered Wu had
jumped off the overpass taking his own life. But when his body was sent to the
Travis County Medical Examiner's office analyzing Wu's brains, examiners noted
no residual metastatic melanoma. Meaning Wei Wu did not have brain cancer.

 

Both the Jetton and the Wu cases happened in 1999. Two other patients also filed
suit against the doctor.


The State Board of Medical Examiners investigated Dr. Neely. The board found
Neely had a history of hand tremors and that between 1999 and 2002, Dr. Neely
was writing prescriptions, not only for his patients but for himself as well. Narcotics,
muscle relaxers and pain killers. Something former patient Paul Jetton
finds shocking.

 Paul Jetton: Narcotics, opiates, I mean it's just things that, I mean things that they
don't even let people operate machinery or drive cars when they're, when they're
taking them and this guy's doing brain surgery on people. I mean it's just, even now
I'm just, it's just incredulous, you just can't even believe that it even happened.


 Wilson: The State Board of Medical Examiners did discipline Dr. Neely. This past
December, they suspended his license but gave it right back by staying the
suspension. Now he's on probation for three years. The only requirements are that
he see a psychiatrist and not write prescriptions for himself or his family. A decision
the board defends.


 Jill Wiggins [caption identifies her as a Board representative]: We have compliance
officers and the compliance officers will definitely follow to make sure that he's
doing the things that his order requires him to do.


 Wilson: But how would they know if he is using? He can get somebody else to
prescribe him. I mean he could say, "I've followed the order."


 Wiggins: Right.


 Wilson: I didn't prescribe myself.


 Wiggins: Right, right.


 Wilson: How do we, how do we know that he's, that we're not putting somebody
right back out there to do the same thing he was doing before?


 Wiggins: That's a very good question and why this order doesn't include drug
testing, I, I honestly don't know the answer to that.


 Paul Jetton: I think it's just deplorable, I mean if, if it was another profession, uh,
the guy would be in jail.


 Wilson: We contacted Dr. Neely for his side to the story. He declined to participate,
but his attorney told us that two highly qualified neurosurgeons who reviewed
the case agree with the medical decisions made by Dr. Neely. In addition, the
State Board of Medical Examiners office investigated the Jetton case and found
no wrong doing. We also contacted St. David's Medical Center, its chief medical
officer believes they have a strong peer review process. That's where individual
doctors review each other's work and decide who should have privileges.


 Steve Berkowitz, M.D.: In this particular case the investigation is incomplete
and when we actually find the, get the findings we will then be able to make
a determination uh, as to whether the privileges should be continued or not. We
strongly value quality of course, we value the due process and most importantly we
value patient safety.


 Wilson: Nanci Wilson, KEYE News investigates.



The camera then returns to the anchors, Cantu and Maggio.



Maggio: The Jettons settled their suit against Dr. Neely. The suit filed on behalf of
Wu's son was dismissed because it was not filed by an attorney. The other suits are
pending.


 Cantu: The Texas Board of Medical Examiners does post final actions taken against
doctors on its web site, but all other information about complaints is kept secret. 



 Neely sued Wilson, KEYE, and Viacom for libel. Appellees filed a motion for
summary judgment asserting both traditional and no-evidence grounds. Neely filed a response with
evidence. Both sides filed objections to the other party's summary-judgment evidence. Following
a hearing, the district court sustained some of appellees' objections to Neely's evidence and granted
appellees' summary-judgment motion without stating the grounds. Subsequently, the district court
signed a final judgment that Neely take nothing on his claims. Neely appealed.


STANDARD OF REVIEW

 We review the district court's summary judgment de novo. Valence Operating Co.
v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005); Provident Life & Accident Ins. Co. v. Knott,
128 S.W.3d 211, 215 (Tex. 2003). Defamation cases are reviewed under the same summary-judgment standards as other cases even though they involve constitutional considerations. See
Casso v. Brand, 776 S.W.2d 551, 556-57 (Tex. 1989).

 Under rule 166a(i), a movant must assert that, after adequate time for discovery, there
is no evidence of one or more essential elements of a claim or defense on which the adverse party
would have the burden of proof at trial. Tex. R. Civ. P. 166a(i); see Fort Worth Osteopathic Hosp.,
Inc. v. Reese, 148 S.W.3d 94, 99 (Tex. 2004). To defeat a rule 166a(i) motion, the non-movant must
produce more than a scintilla of summary-judgment evidence raising a genuine issue of material fact
on the challenged elements. Tex. R. Civ. P. 166a(i); Ford Motor Co. v. Ridgway, 135 S.W.3d
598, 600 (Tex. 2004). A no-evidence summary judgment is essentially a directed verdict granted
before trial, to which we apply a legal-sufficiency standard of review. King Ranch, Inc. v. Chapman,
118 S.W.3d 742, 750-51 (Tex. 2003); Perdue v. Patten Corp., 142 S.W.3d 596, 603
(Tex. App.--Austin 2004, no pet.). A no-evidence summary judgment will be sustained when: 
(1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or
of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence
offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes
the opposite of a vital fact. City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005); King Ranch,
118 S.W.3d at 751. More than a scintilla of supporting evidence exists if the evidence would allow
reasonable and fair-minded people to differ in their conclusions. King Ranch, 118 S.W.3d at 750-51.
"Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create
a mere surmise or suspicion' of a fact." Id. (quoting Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63
(Tex. 1983)).

 On the other hand, a defendant moving for a traditional summary judgment under
rule 166a(c) must conclusively negate at least one essential element of each of the plaintiff's causes
of action or conclusively establish each element of an affirmative defense. Tex. R. Civ. P. 166a(c);
Science Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997). Once the defendant has done
so, the burden shifts to the plaintiff to produce evidence creating a fact issue on the element
or defense in order to defeat the summary judgment. See Walker v. Harris, 924 S.W.2d 375, 377
(Tex. 1996).

 Where, as here, the trial court does not specify its basis for granting summary
judgment, the judgment must be affirmed if any of the grounds asserted in the motion has merit. See
Star-Telegram, Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995).


ANALYSIS

 To maintain a cause of action for defamation, as Neely asserts here, a plaintiff
must prove that the defendant: (1) published a statement "of and concerning" him; (2) that
was defamatory; (3) with the requisite degree of fault with respect to whether it was false. See
WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998); Carr v. Brasher, 776 S.W.2d 567,
569 (Tex. 1989). Because the published statements made the basis for Neely's claims were read
from a script and broadcasted, Neely's defamation claims allege libel rather than slander, and are
thus governed by chapter 73 of the civil practice and remedies code. See Christy v. Stauffer Publ'ns,
Inc., 437 S.W.2d 814, 815 (Tex. 1969). Chapter 73 defines a libel in relevant part as "a defamation
expressed in written or other graphic form . . . that tends to injure a living person's reputation and
thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach
any person's honesty, integrity, virtue, or reputation." Tex. Civ. Prac. & Rem. Code Ann. § 73.001
(West 2005); Abbott v. Pollock, 946 S.W.2d 513, 519 (Tex. App.--Austin 1997, writ denied). 

 Implicit in the elements of defamation, and explicit under chapter 73, is that a
true statement is not actionable as libel, although the Texas Supreme Court has not yet definitively
resolved, for all fact situations, whether a plaintiff must prove the falsity of a statement as an element
of his libel claim as opposed to the defendant having the burden of proving the statement's truth as
an affirmative defense. See Tex. Civ. Prac. & Rem. Code Ann. § 73.005 (West 2005) ("The truth
of the statement in the publication on which an action for libel is based is a defense to the action.");
Bentley v. Bunton, 94 S.W.3d 561, 586 n.63 (Tex. 2003) (reserving question of whether non-public
figure is required to prove falsity of statement made by media defendant).

 In addition, a libel plaintiff must establish injury and damages from the statement. 
If the statement is "defamatory per se"--of a nature that the law considers so damaging to reputation
that harm to the plaintiff's reputation is presumed--the plaintiff need not plead or prove
specific injury or damage to reputation. See Bentley, 94 S.W.3d at 604-05; but see id. at 605-07
(First Amendment may limit such awards). Otherwise, the statement is "defamatory per quod," and
the plaintiff must prove specific injury and damages to prevail. See Texas Disposal Sys. Landfill,
Inc. v. Waste Mgmt. Holdings, Inc., 219 S.W.3d 563, 580 (Tex. App.--Austin 2007, pet. denied). In their summary-judgment motion, appellees asserted essentially five sets of
traditional grounds. First, appellees argued that the statements in question were "substantially true"
as a matter of law, a concept that we explore in detail below. Among their arguments in support of
this ground, appellees advocated what they term the "third-party allegation rule," urging that a
media defendant can establish the substantial truth of a publication reporting that third parties
are asserting or alleging facts by proving that the allegations were made and accurately reported,
without regard to whether the underlying allegations being reported are in themselves true or false.
Relying on this concept, appellees argued that Neely's claims were predicated on accurately
reported third-party allegations or investigatory conclusions actually made by the Jettons, Yu,
the Travis County Medical Examiner, and the Board. Second, appellees relied upon the statutory
privileges for "fair, true, and impartial" reporting of judicial or other official proceedings and "fair
comment." See Tex. Civ. Prac. & Rem. Code Ann. § 73.002 (West 2005). Third, appellees sought
to demonstrate that Neely was a limited-purpose public figure who was required to prove that they
had published the statements with actual malice as to their truth or falsity, not merely negligence.
See WFAA-TV, Inc., 978 S.W.2d at 571. They further presented evidence--including a lengthy
affidavit from Wilson detailing her research prior to the broadcast--in an attempt to conclusively
negate actual malice.

 In addition to the traditional grounds applicable to Neely's claims against all three of
them, appellees sought summary judgment on Neely's claims against Viacom on grounds that the
evidence conclusively negated any involvement by Viacom in the news gathering or publication of
the broadcast. Finally, appellees also sought summary judgment on all claims asserted by Neely's
professional association on grounds that it could not maintain its libel action as a matter of law.

 Appellees' no-evidence grounds challenged the existence of evidence that (1) the
statements in question were false or not substantially true; (2) the statements had a defamatory
meaning; (3) the statements were not privileged or that appellees had abused applicable privileges;
(4) appellees acted with fault (either actual malice or negligence); (5) Neely was injured; (6) Neely
incurred damages; (7) Viacom published the statements in question; or (8) Viacom was otherwise
involved in preparing the broadcast.

 On appeal, Neely brings seven issues challenging the district court's
summary judgment. He first complains generally that the district court erred in granting
appellees' summary-judgment motion and rendering a take-nothing judgment on his claims. In his
second issue, Neely asserts that the district court erred in granting summary judgment because he
presented evidence raising a fact issue as to each element of his libel claim. In his third through
fifth issues, Neely challenges the judgment to the extent it is based on appellees' contentions
regarding the "third-party allegation rule" (fourth issue), privileges (fifth issue), or a determination
that Neely is a limited-purpose public figure (third issue). In the event he is held to be a limited-purpose public figure, Neely argues in the alternative that he presented summary-judgment evidence
raising a fact issue as to actual malice. In his sixth issue, Neely urges that the district court erred in
granting summary judgment against the claims of his professional association on grounds that
it could not maintain a defamation claim. Finally, in his seventh issue, Neely complains of the
district court's rulings excluding some of his summary-judgment evidence, including the two letters
from the Board advising him of its determination that he had not violated the medical practice act
in his care for Paul Jetton and Wu.

 Although Neely's first and second issues are stated more broadly, he has
not presented argument or authorities challenging summary judgment as to his claims against
Viacom on the ground that the company had no involvement in the alleged acts or omissions that
are the bases for Neely's suit. Consequently, Neely has waived any challenge with respect to
that ground. See Tex. R. App. P. 38.1(i). And, because that ground can independently support the
summary judgment as to Neely's claims against Viacom, we must affirm that portion of the
judgment regardless of our disposition of the other summary-judgment grounds. See Star-Telegram,
Inc., 915 S.W.2d at 473.

 Remaining at issue is the summary judgment as to Neely's claims against Wilson and
KEYE (the "KEYE defendants"). 


Defamatory meaning and substantial truth

 The parties join issue primarily with respect to whether the statements published by
the KEYE defendants had a defamatory meaning and, if so, whether the summary-judgment evidence
presents a fact issue as to their falsity. Courts decide, as a threshold matter, whether or not a
publication is capable of a defamatory meaning. See Turner v. KTRK Tel., Inc., 38 S.W.3d 103,
114 (Tex. 2000). When doing so, the publication "should be construed as a whole in light of the
surrounding circumstances based upon how a person of ordinary intelligence would perceive it." 
Id. Thus, we do not engage in "a technical analysis" of each statement in isolation, but consider the
publication as a whole, New Times, Inc. v. Isaacks, 146 S.W.3d 144, 154 (Tex. 2004), viewed
"'not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by
the natural probable effect on the mind of the average [viewer].'" Turner, 38 S.W.3d at 114 (quoting
Kapellas v. Kofman, 459 P.2d 912, 920 (Cal. 1969) (en banc)). If the publication's meaning is
ambiguous or doubtful, the jury must determine its meaning. See id. 

 In suits against media defendants, a statement is not actionable if it is "substantially
true." Under the "substantial truth" doctrine, minor inaccuracies are not actionable as long as the
publication's "gist" or "sting" is true, see id. at 115, and a "true" statement for these purposes is one
that is not more damaging to the plaintiff's reputation than a literally true statement would have
been. McIlvain v. Jacobs, 794 S.W.2d 14, 16 (Tex. 1990). Furthermore, a true or substantially true
account of facts is not made actionable merely because a viewer might infer additional but unstated
false or defamatory facts from that account. See Randall's Food Mkts., Inc. v. Johnson, 891 S.W.2d
640, 646 (Tex. 1995) (true statements that a grocery store manager had failed to pay for item
at check-out were not false and defamatory merely because hearers might have inferred that she was
dishonest; "Randall's never accused [the manager] of theft or of having the intent to steal," nor
did employees "speculate or make accusations regarding [the manager's] intent"). Similar to the
question of defamatory meaning, "substantial truth" can be decided as a matter of law if the meaning
of the publication (i.e., a reasonable person's perception of the publication as a whole) is
unambiguous and the material underlying facts are not in dispute; otherwise, the jury must first
determine these matters. See id.

 Neely has briefed and argued the issue of whether the KEYE defendants' statements
at issue are true or false as if he had the burden, in responding to appellees' summary-judgment
motion, to raise a fact issue as to whether they were not substantially true, and he does not
contend otherwise. We will, therefore, assume without deciding that it was Neely's burden to
present a fact issue that any allegedly defamatory statements at issue are not substantially true. 

 Viewing the broadcast as a whole, it was, consistent with its origins, plainly
calculated to raise questions regarding how effectively the Texas Board of Medical Examiners
and the medical peer review process ensure patient safety by taking action against doctors who
endanger patients. To that end, the broadcast featured a negative portrayal of Dr. Neely and his
medical practice. The parties dispute whether this portrayal consisted of defamatory and false
statements that are actionable against the KEYE defendants. Neely insists that the broadcast as a
whole was capable of being perceived by the ordinary viewer as asserting that he (1) had used
"dangerous drugs" and was impaired during surgeries; (2) had performed unnecessary surgeries; and
(3) had hand tremors that undermined his surgical competence. None of these assertions, Neely
insists, is substantially true. Appellees counter that the broadcast does not actually contain all of the
defamatory assertions Neely attributes to it, see id. at 646, and that any defamatory assertions it does
contain are substantially true. See Bentley, 94 S.W.3d at 587 ("That a statement is defamatory--that
is, injurious to reputation--does not mean that it is false, and vice versa.").

 

 Third-party allegations

 The parties dispute the legal significance of allegedly defamatory assertions
Neely perceives in the numerous statements, findings, or allegations made by persons other than
the KEYE defendants that were presented or reported during the broadcast. A media defendant's
reporting of a statement or allegation made by a third party may communicate factual assertions, and
thus potentially be false or defamatory, at two levels--(1) the media defendant's own statements
regarding whether the third party made a statement or allegation and depicting the content of the
statement or allegation; and (2) the facts communicated in the underlying third-party statement or
allegation itself. The parties advance diametrically opposed positions as to which levels are relevant
to our analysis. 

 In his fourth issue, Neely urges that we must consider both levels, including whether
the underlying third-party allegation is in itself defamatory and not substantially true. In contrast,
appellees' "third-party allegation rule" would look only to the first level, in essence viewing the
reported third-party allegation not as an assertion of any facts the third party is stating, but as
an assertion only of the fact that the third party has said them. If the media defendant accurately
reported the fact that the third-party allegation was made and its content, appellees reason, the
report is substantially true and not actionable against the media defendant, regardless of whether
the underlying third-party allegation was in itself defamatory and false. This conclusion, in turn,
impacts how we assess the broadcast's meaning to the ordinary viewer--whether reported third-party
allegations are viewed in themselves as factual assertions being republished by and attributable to the
KEYE defendants who reported them, as Neely suggests, or regarded merely as reports about the
existence or fact of "various third-party allegations, lawsuits, proceedings, and public controversies
related to Neely" being asserted by others, and whose underlying content is not attributable to the
KEYE defendants, as appellees urge.

 Neely argues that appellees' third-party allegation rule "is not, and never has been, the
law in Texas (or, as far as [he] can discern, anywhere else in the country)," and that it would effect
"a radical, indeed breathtaking, departure from long established bedrock principles of defamation
law," would give media defendants "immunity to knowingly publish false and defamatory
statements" (so long as such statements are originated by third parties), and would effectively destroy
whatever remaining protections citizens still possess when their reputations are attacked by the
media. In support of his view, Neely emphasizes that liability for defamation and libel is predicated
on the act of publication rather than origination or authorship. See Tex. Civ. Prac. & Rem. Code
Ann. § 73.002, §§ .003, .004 (West 2005); WFAA-TV, Inc., 978 S.W.2d at 571 ("To maintain a
defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement
. . . ."). Consequently, as Neely observes, it has long been the rule that one who republishes a
defamatory statement published by another may be held liable for his own act of publication. See,
e.g., Dement v. Houston Printing Co., 37 S.W. 985, 986 (Tex. Civ. App.--Galveston 1896,
writ ref'd n.r.e.) ("The law is clear upon the subject. One who publishes a defamatory statement
made by another cannot justify by proving that the other made the statement. By publishing it, he
becomes responsible for his own act in doing so, and, if he seeks to justify, he must prove the truth of
the charge published."); see also Liberty Lobby, Inc. v. Dow Jones & Co., Inc., 838 F.2d 1287, 1289
(D.C. Cir. 1988) ("The common law of libel has long held that one who republishes a defamatory
statement 'adopts' it as his own, and is liable in equal measure with the original defamer."). Neely
further observes that the legislature in chapter 73 of the civil practice and remedies code enacted
privileges that limit liability for publication or republication of third-party defamations under certain
circumstances, thereby presuming the existence of the general rule of liability for republication on
which he relies. See Tex. Civ. Prac. & Rem. Code Ann. §§ 73.002(a) (privileges for "fair, true, and
impartial" accounts of certain governmental proceedings and "reasonable and fair comment or
criticism" of "matter[s] of public concern"; privileges "do[] not extend to the republication of a
matter if it is proved that the matter was republished with actual malice after it had ceased to be of
public concern"), .004(a) ("A broadcaster is not liable in damages for a defamatory statement
published or uttered in or as part of a radio or television broadcast by one other than the broadcaster
unless the complaining party proves that the broadcaster failed to exercise due care to prevent the
publication or utterance of the statement in the broadcast.").

 In support of their "third-party allegation rule," appellees rely on a line of Texas court
of appeals cases that apply what the courts perceive to be the Texas Supreme Court's holding in
McIlvain v. Jacobs, 794 S.W.2d 14 (Tex. 1990). McIlvain involved a libel suit complaining of a
television news broadcast concerning an internal investigation being conducted by the City of
Houston's Public Integrity Review Group ("PIRG") into allegations that some municipal employees
were misusing public resources for personal ends. The report discussed both the existence of the
investigation and various allegations by city employees and law enforcement that the investigation
had uncovered. See id. at 15. (5) Two employees who had been implicated in the broadcast, Jacobs
and Moore, sued the reporter and television station for defamation. The defendants moved for
summary judgment on grounds that included the truth of the broadcast. The trial court granted the
motion. The Fourteenth Court of Appeals reversed, holding that there were fact issues as to whether
the broadcast was true. See Jacobs v. McIlvain, 759 S.W.2d 467, 469 (Tex. App.--Houston
[14th Dist.] 1988), rev'd, 794 S.W.2d 14 (Tex. 1990). The court of appeals focused solely on the
truth of the underlying allegations contained in the broadcast and emphatically rejected the
defendants' arguments that it should consider only whether the report accurately reported the
investigation and allegations:


The summary judgment evidence certainly does not show that the underlying charges
were true as a matter of law. Appellees stand by their story, maintaining that the
essence of the broadcast was that charges had been made. In other words, journalists
should be able to report the very fact of governmental self-scrutiny. And presumably
under this umbrella they can publish potentially defamatory statements as a matter
of law. We disagree. Merely alleging that an investigation was in progress does not
entitle a journalist to publish free-standing allegations which are, as a matter of law,
legally immune from examination under the law of libel.



Id. The court went on to invoke the longstanding rule that a republisher of a defamation is
independently liable for that publication. Id. ("Although [defendants'] argument of 'truth' as a
complete defense has much to commend it, the law does not generally immunize the propagation of
defamatory statements. It is no defense to say, 'It is alleged that . . . .'").

 In a two-page opinion, the Texas Supreme Court reversed. See 794 S.W.2d at 15-16.
After quoting the statements made in the broadcast, the court began its analysis by emphasizing
that summary judgment would be appropriate if the statements were shown to be substantially
true, and that this standard "involves consideration of whether the alleged defamatory statement
was more damaging to Jacob's reputation, in the mind of the average listener, than a truthful
statement would have been." Id. at 16. This emphasis contrasts with the court of appeals' opinion,
which did not mention the substantial-truth standard or purport to apply its substance when analyzing
whether the underlying factual allegations had been shown to be true as a matter of law. See Jacobs,
759 S.W.2d at 468-69.

 The supreme court then compared the broadcast to evidence concerning the
investigation and concluded, "McIlvain's broadcast statements are factually consistent with PIRG's
investigation and its findings." McIlvain, 794 S.W.2d at 16. The court then compared the contents
of the broadcast to the PIRG investigative report:



 "The broadcast stated that an investigation into the use of city employees for private work
was underway. The affidavits of assistant city attorney Brenda Loudermilk and city legal
department investigator V.H. Shultea, Jr. confirm the existence of the investigation." Id.

 "The broadcast further stated that employees of the city water maintenance division allege
four employees were used on city time to care for the elderly father of Emerick Jacobs.
According to the City of Houston's legal department report, employees of the water
maintenance division had gone on separate occasions with Joyce Moore to St. Joseph's
Hospital or to the home of Jacob's father and sat with him while he was ill. Sworn
statements by a division employee indicate that on three occasions, Moore and other water
division employees would visit Jacob's father in the hospital during work hours, staying there
for a half day or longer. While on these visits, the employees were paid their regular city
wages." Id.

 "According to the broadcast, these employees put in overtime so they could get their jobs
done. The PIRG investigation found from the payroll division office records that on several
occasions, when these employees were absent from the office for as long as four hours caring
for the elder Mr. Jacobs, they requested and received overtime." Id.

  "The broadcast further stated that police investigators were looking for a gun at the water
facility but instead found liquor bottles and that one city employee claimed drinking on the
job was not unusual. The report stated that the search of Joyce Moore's desk produced a
liquor bottle but no gun. The PIRG report also contained statements by employees that
Moore and Jacobs were seen in Moore's office drinking alcohol." Id.




The supreme court concluded that this "comparison of the contents of the broadcast and the PIRG
report demonstrates that the broadcast was substantially correct, accurate, and not misleading," and
that McIlvain had established the substantial truth of the broadcast as a matter of law. Id. 

 The Fourteenth Court of Appeals--the same court of appeals as in
McIlvain--subsequently addressed the implications of McIlvain in KTRK Television v. Felder,
950 S.W.2d 100 (Tex. App.--Houston [14th Dist.] 1997, no writ). Felder arose from a series of
television news broadcasts that reported on third-party allegations that a teacher had physically
and verbally abused students and a subsequent school district investigation. See id. at 103-04. The
broadcast station moved for summary judgment on grounds that included the substantial truth of the
broadcast, which the trial court denied. In analyzing the substantial-truth issue, the court of appeals
considered whether McIlvain required it to evaluate the truth of the underlying allegations or only
whether the allegations had been accurately reported. See id. at 106. "Based on our reading of both
the Supreme Court and appellate court opinions," the court concluded, "when, as in this case, the
report is merely that allegations were made and they were under investigation, McIlvain only
requires proof that allegations were in fact made and under investigation in order to prove substantial
truth." Id. The court further reasoned that this was the only conceivable reading of McIlvain if one
considers the practical implications of a contrary interpretation: 


Otherwise, the media would be subject to potential liability everytime it reported
an investigation of alleged misconduct or wrongdoing by a private person,
public official, or public figure. Such allegations would never be reported by the
media for fear an investigation or other proceeding might later prove the allegations
untrue, thereby subjecting the media to suit for defamation. Furthermore, when
would an allegation be proven true or untrue for purposes of defamation? After an
investigation? After a court trial? After an appeal? Undoubtedly, the volume of
litigation and concomitant chilling effect on the media under such circumstances
would be incalculable. First Amendment considerations aside, common sense does
not dictate any conclusion other than the one we reach today.



Id. The court went on to hold that summary judgment was warranted based on the substantial truth
of the broadcast because it had accurately depicted the third-party allegations and the existence of
the investigation into the teacher's conduct. Id. at 106-07.

 Following the lead of the Fourteenth Court in Felder, the San Antonio and Fort Worth
courts of appeals, as well as the Fifth Circuit, have relied on McIlvain and Felder for the proposition
that a media defendant's reporting of third-party allegations and any investigation thereof is
substantially true if it accurately depicts the allegations being made and the existence of any
investigation, regardless of whether the underlying allegations are themselves substantially true. See
ABC Inc. v. Gill, 6 S.W.3d 19, 33 (Tex. App.--San Antonio 1999, pet. denied) ("In sum, ABC
accurately reported the rise and fall of Gill Savings and the RTC's investigation of and allegations
against the Gills. No more is required."); UTV of San Antonio, Inc. v. Ardmore, Inc., 82 S.W.3d 609,
611-12 (Tex. App.--San Antonio 2002, no pet.) ("When a case involves a media defendant,
the defendant need only prove that third party allegations reported in a broadcast were, in fact, made
and under investigation; it need not demonstrate the allegations themselves are substantially true.");
Grotti v. Belo Corp., 188 S.W.3d 768, 771 (Tex. App.--Fort Worth 2006, pet. denied) ("We hold
that the Media Defendants established the substantial truth of each broadcast by accurately reporting
third-party allegations and investigations."); Green v. CBS, Inc., 286 F.3d 281, 284 (5th Cir. 2002)
(Texas law) (broadcast reported sensational allegations against lottery winner and ex-wife; "In
cases involving media defendants, such as this, the defendant need not show the allegations are
true, but must only demonstrate that the allegations were made and accurately reported."); see also
Associated Press v. Boyd, No. 05-04-01172-CV; 2005 Tex. App. LEXIS 3715, at *3
(Tex. App.--Dallas May 16, 2005, no pet.) (mem. op.) ("[M]edia defendants need only prove third-party allegations reported were made, not that the allegations themselves were true."). (6) This Court
has also relied on this concept when analyzing whether there was evidence of a media defendant's
actual malice in publishing an article reporting that a complaint of official misconduct had been
filed against a local prosecutor. See Cox Newspapers, L.P. v. Penick, 219 S.W.3d 425, 431, 443
(Tex. App.--Austin 2007, pet. denied). We held that there was no evidence of actual malice because
the prosecutor "cannot show that the primary contents of the . . . article were false," reasoning that
except for three "misstated errors" that had been corrected by a subsequent letter to the editor by the
complainant, the article "accurately reported that the allegations had been filed . . . and were
pending." Id. (citing Grotti for the proposition that "to prove substantial truth, the defendants need
only prove that the third party allegations were in fact made and that the allegations were under
investigation").

 Appellees view McIlvain and its progeny, including Penick, as establishing as a
clear principle of Texas law that a media defendant's statements about third-party allegations are
"substantially true" if accurate in reporting that the allegations were made and their content,
regardless of whether the allegations are themselves true. In other words, as appellees put it,
media defendants thus need not "prove the truth of the third-party allegations before they may
report on the allegations." (7) Neely counters that appellees' arguments and the court of appeals cases
on which they rely are founded on a misreading of McIlvain, that this Court did not squarely
adopt the third-party allegation rule in Penick, and that we are not bound by and should not follow
the decisions from our sister courts that apply the concept. In Neely's view of McIlvain, the
Texas Supreme Court looked not only to whether McIlvain accurately reported the investigation
and allegations in question, but also considered whether the underlying allegations made the subject
of the investigation were substantially true. Neely emphasizes that the supreme court in McIlvain
compared the broadcast's account of city employee allegations with the PIRG report's findings. See
McIlvain, 794 S.W.2d at 16. This, in Neely's view, is an analysis of whether the substantial truth
of the underlying allegations was conclusively established by the summary-judgment evidence,
not merely an analysis of whether the broadcast had accurately reported the existence of the
investigation and allegations.

 Neely further suggests that it is unlikely, given McIlvain's brevity and the fact that
it never mentions the concept, that the supreme court perceived it was altering or creating
an exception to the traditional rule of liability for republication that had been emphasized by the
court of appeals. As Neely observes, McIlvain "consumes just over two pages," "does not purport
to examine the long-standing republication rule, much less reverse or carve out an exception to it,"
"does not announce any new rule of law, nor does it contain the constitutional or other analysis one
would expect if the court had intended such a change." With this, Neely questions whether any
doctrinal basis would exist for such a holding. To the extent such a holding was based on
Texas common law, Neely urges, it would amount to judicial abrogation of the legislature's
balancing of interests reflected in chapter 73's privileges in a manner that renders the statutory
privileges superfluous. See Tex. Civ. Prac. & Rem. Code Ann. §§ 73.002(a), .004(a). Nor, Neely
asserts, would there be any textual support in the Texas Constitution, which, "[u]nlike the United
States Constitution, . . . expressly guarantees the right to bring reputational torts" under common
law. See Turner, 38 S.W.3d at 117 (citing Tex. Const. Ann. art. I, §§ 8, 13); see also Ex parte Tucci,
859 S.W.2d 1, 19-23 (Tex. 1993) (Phillips, C.J., concurring) (analyzing this feature of article I,
section 8). As for the First Amendment to the federal constitution, what appellees ultimately
advocate, Neely urges, is a greatly expanded version of the "neutral reportage doctrine" that some
federal courts have derived from the First Amendment. See Harte-Hanks Comm'n v. Connaughton,
491 U.S. 657, 660 n.1 (1989) (doctrine as recognized in some lower courts "immunizes from liability
the accurate and disinterested reporting of serious charges made against a public figure by a
responsible, prominent organization"). However, the U.S. Supreme Court has never adopted this
doctrine, see id.; see also id. at 689 ("In a case such as this involving the reporting of a third party's
allegations, recklessness may be found where there are obvious reasons to doubt the veracity of the
informant or the accuracy of his reports." (citation omitted)), nor has the Texas Supreme Court ever
purported to do. See also Brady v. Cox Enters., Inc., 782 S.W.2d 272, 275-76 (Tex. App.--Austin
1989, no writ) (observing that "[a] privilege of accurate re-publication has not, to our knowledge,
been recognized in Texas courts" and declining to accept it as a basis for affirming summary
judgment for newspaper in libel suit). Indeed, in their briefing on appeal, appellees never identify
a doctrinal basis for their third-party allegation rule beyond insisting that this is what McIlvain and
its progeny have held.

 In the alternative, Neely argues that to the extent that Texas courts of appeals
have recognized appellees' third-party allegation rule, the present case is distinguishable because
"the relevant governmental body [the Board] had completed its investigation prior to the Broadcast
and had made findings, which demonstrated that the gist of the broadcast, and certain allegations in
it, were false."

 Although we agree with Neely that this Court has not previously addressed the
question head-on, we are compelled to agree with appellees that McIlvain stands for the proposition
that a media defendant's reporting that a third party has made allegations is "substantially true" if,
in fact, those allegations have been made and their content is accurately reported. Although McIlvain
is somewhat oblique in its analysis, a close examination reveals that the supreme court was focused
on whether the third-party allegations reported in the broadcast to be under investigation had, in fact,
been made and investigated, as reflected in the PIRG report. See McIlvain, 794 S.W.2d at 16.
Contrary to Neely's assertions, the supreme court's analysis is not couched in terms of determining
whether summary-judgment evidence conclusively established the substantial truth of the underlying
allegations themselves, but in terms of whether the evidence (the PIRG report, which itself was a
series of allegations and findings about those allegations) demonstrated that the allegations had in
fact been made and investigated as reported. See id. The supreme court's reasoning implies that
when a media defendant reports on the existence of third-party allegations (what appellees term
allegations "presented as just that--allegations"), the focus of the substantial-truth inquiry is on
whether the allegations were in fact made and accurately reported, regardless of the truth of
the allegations themselves. In effect, we assume that the ordinary viewer perceives "allegations
presented as allegations" to assert merely the fact that the allegations had been made rather than
asserting or vouching for any facts referenced in the allegations.

 We acknowledge that Neely raises some perplexing questions regarding the doctrinal
basis for the supreme court's holding, questions that the McIlvain opinion did not clearly answer.
We must conclude nonetheless that Neely's arguments are ultimately complaints that McIlvain was
wrongly decided. As an intermediate appellate court, we are bound to follow McIlvain unless and
until the Texas Supreme Court instructs us otherwise. See Petco Animal Supplies, Inc. v. Schuster,
144 S.W.3d 554, 565 (Tex. App.--Austin 2004, no pet.). We overrule Neely's fourth issue.


 Neely's complaints

 Informed by our conclusions about McIlvain, we now turn to whether the broadcast
as a whole was capable of the defamatory meanings Neely perceives and, if so, whether Neely raised
a fact issue as to whether these assertions, so perceived, were not substantially true. 

 

 Use of and impairment from"dangerous drugs"

 Neely emphasizes that the broadcast begins with a question posed by anchor
Fred Cantu (but written by Wilson) inquiring, "If you were told you needed surgery would you
want to know if your surgeon had been disciplined for prescribing himself and taking dangerous
drugs . . .?" The report then identifies Neely as the surgeon who is the focus of the broadcast. After
a discussion of the Jetton and Wu lawsuits, the broadcast proceeds to the following discussion of the
Board's order and disciplinary action:


 Wilson: . . . The State Board of Medical Examiners investigated Dr. Neely. The
board found Neely had a history of hand tremors and that between 1999 and 2002,
Dr. Neely was writing prescriptions, not only for his patients but for himself as well.
Narcotics, muscle relaxers and pain killers. Something former patient Paul Jetton
finds shocking.


 Paul Jetton: Narcotics, opiates, I mean it's just things that, I mean things that they
don't even let people operate machinery or drive cars when they're, when they're
taking them and this guy's doing brain surgery on people. I mean it's just, even now
I'm just, it's just incredulous, you just can't even believe that it even happened.


 Wilson: The State Board of Medical Examiners did discipline Dr. Neely. This past
December, they suspended his license but gave it right back by staying the
suspension. Now he's on probation for three years. The only requirements are that
he see a psychiatrist and not write prescriptions for himself or his family. A decision
the board defends.


 Jill Wiggins [Board representative]: We have compliance officers and the
compliance officers will definitely follow to make sure that he's doing the things that
his order requires him to do.


 Wilson: But how would they know if he is using? He can get somebody else to
prescribe him. I mean he could say, "I've followed the order."


 Jill Wiggins: Right.


 Wilson: I didn't prescribe myself.


 Jill Wiggins: Right, right.


 Wilson: How do we, how do we know that he's, that we're not putting somebody
right back out there to do the same thing he was doing before?


 Jill Wiggins: That's a very good question and why this order doesn't include drug
testing, I, I honestly don't know the answer to that.


 Paul Jetton: I think it's just deplorable, I mean if, if it was another profession, uh,
the guy would be in jail.



 Neely first complains that this portion of the broadcast, especially in the context
of Cantu's introductory questions about a hypothetical surgeon who "had been disciplined for
prescribing himself and taking dangerous drugs," is capable of being understood by an ordinary
viewer as asserting that he had been disciplined by the Board for taking "dangerous drugs," not
merely self-prescribing them. We agree that the broadcast is capable of being so understood by the
ordinary viewer. Indeed, this was the import of Cantu's introductory statement referring to a surgeon
(soon identified as Neely) who "had been disciplined for prescribing himself and taking dangerous
drugs." This message was reinforced by Wilson's subsequent questions to Board representative
Wiggins regarding Neely's "using" and the advisability of mandatory drug testing.

 Appellees contend, however, that to the extent the broadcast indicates that Neely
was disciplined by the Board for "taking dangerous drugs," it was a substantially true account of
the Board's disciplinary action. We agree with appellees. Appellees emphasize, and Neely does not
dispute, that the Board disciplined him for self-prescribing medications that included narcotics
and other substances that had the potential to impair his ability to perform surgery. Such substances
could accurately be described as "dangerous drugs" in terms of their potential risks to someone
consuming them, including surgeons--and, in fact, the Board's order uses that term, prohibiting
Neely from prescribing "controlled substances or dangerous drugs with addictive potential or
potential for abuse" to himself or his immediate family. Neely also admitted during his deposition
that he not only self-prescribed these substances, but used some of them. Neely insists, however,
that the broadcast nonetheless departed from the true facts because he was not disciplined by the
Board for taking these medications, per se. Instead, Neely insists, the Board disciplined him solely
for self-prescribing the medications.

 We conclude that any factual discrepancies here would not rise to the level of
rendering an assertion that Neely was "disciplined for . . . taking dangerous drugs" not substantially
true. Neely's use of self-prescribed medications was plainly a focus of the Board's order. The order
prohibited Neely from prescribing, dispensing, or administering "controlled substances or dangerous
drugs with addictive potential or potential for abuse" to himself. Furthermore, the order was
consistent with a concern of the Board that Neely might have become addicted to medications he was
self-administering. The order required him to be evaluated by a Board-appointed psychiatrist who
was board-certified in forensic or addictive psychology. These evaluations had not yet been
performed, or the underlying issues resolved, at the time of the broadcast. In short, even if it was
not literally true that Neely had been "disciplined for . . . taking dangerous drugs" in terms of the
precise legal bases of the Board's order, that assertion would at least be substantially true because
it would be no more damaging to Neely's reputation in the eyes of the ordinary viewer than a literally
true recitation of the Board's order would have been. See McIlvain, 794 S.W.2d at 16.

 Neely further complains that the broadcast is capable of being understood by the
ordinary viewer as going farther to assert that (1) he had operated on patients while under the
influence of the medications he was self-prescribing (and/or using) and that (2) this was the
conduct for which the Board had disciplined him. Neither assertion, Neely insists, is substantially
true. While acknowledging that he had used narcotics and other medications he had self-prescribed,
Neely presented summary-judgment evidence that he did so only at times when it would not affect
his treatment of patients, that his use was for legitimate medical needs, and that he had never
treated or operated on patients while under the influence of drugs. Similarly, while a fully accurate
depiction of the Board's order would have been damaging to Neely's reputation as a neurosurgeon
(as was the broadcast's substantially true depiction of the order as disciplining him for "taking . . .
dangerous drugs"), to suggest that the Board disciplined him for operating on patients while under
the influence of those drugs, Neely suggests, would be so much more egregious a disciplinary ground
as to exceed the limits of the substantial-truth doctrine. See Turner, 38 S.W.3d at 118.

 In response, appellees insist that the broadcast is not capable of being understood as
asserting that Neely had operated on patients while under the influence of drugs or that the Board had
disciplined him for such acts. Appellees emphasize that no one from KEYE made such an assertion
during the broadcast and that, to the contrary, Wilson provided an accurate (or at least substantially
true) description of the Board's order. Neely's arguments to the contrary center on Paul Jetton's on-camera statements, "Narcotics, opiates . . . things that they don't even let people operate machinery
or drive cars when they're, when they're taking them and this guy's doing brain surgery on people,"
and "if it was another profession, uh, the guy would be in jail." Paul's comments are presented in
the broadcast as referring specifically to Wilson's preceding revelation that the Board had disciplined
Neely in connection with his self-prescription of medications. After Wilson recounts that "[t]he
State Board of Medical Examiners investigated Dr. Neely" and "found . . . that between 1999 and
2002, Dr. Neely was writing prescriptions, not only for his patients but for himself as well. 
Narcotics, muscle relaxers and pain killers," she segues to Paul's comments with, "[s]omething
former patient Paul Jetton finds shocking." Then, Paul, with apparent reference to what the Board
"found," observes, "[n]arcotics, opiates, I mean it's just things that, I mean things that they don't
even let people operate machinery or drive cars when they're, when they're taking them." He then
states, ". . . and this guy's doing brain surgery on people." Wilson then continues with her critical
discussion of the Board's disciplinary action and the Board's "defen[se]" or justification for it.

 Considered in context, Paul's statements were capable of being understood by the
ordinary viewer as Paul's own factual inferences or allegations that he derived from the Board's
agreed finding that Neely had self-prescribed medications, namely, that Neely had treated patients
while under their influence. (8)
 Appellees rely on their "third-party allegation rule," urging that this
portion of the broadcast is substantially true and not actionable against them because it accurately
depicted Paul's own allegations. Under McIlvain, we agree. The broadcast explicitly presented
Paul's "allegations as allegations," as indicated by Wilson's preface that the Board's finding was
"[s]omething that former patient Paul Jetton finds shocking."

 In contending that the KEYE defendants' reporting of Paul's statements is actionable,
Neely argues that the KEYE defendants "juxtaposed" Paul's statements with other facts or "omitted"
other material facts to create misleading "impressions" that he had operated on patients while under
the influence of self-prescribed drugs or that the Board had disciplined him for such conduct. He
further complains that the KEYE defendants "linked" these "impressions" to Paul's and Wu's
adverse outcomes and related allegations. Neely relies on the principle--implicit in the rule that
allegedly defamatory publications must be construed as a whole--that a publication comprised of
statements that would each be substantially true or non-defamatory in isolation may nonetheless be
susceptible to a false and defamatory meaning due to the selective juxtaposition or omission of
material facts to create a misleading impression. See Turner, 38 S.W.3d at 114-15. This principle
"represent[s] the converse of the substantial truth doctrine. . . . [it] permit[s] liability for the
publication that gets the details right but fails to put them in their proper context and thereby gets
the story's 'gist' wrong." Id. at 115. For example, in Turner, the Texas Supreme Court held that
a television news investigative report selectively omitted material facts to convey a substantially
false and defamatory impression regarding a then-Houston mayoral candidate's actions as an
attorney in a probate proceeding in which the purported decedent faked his own death. The
report had emphasized that the candidate, Hon. Sylvester Turner, "[d]espite the signs of something
fishy . . . began the legal effort to get millions in insurance money released and get his mutual friend
. . . appointed as administrator over the estate," and aided the friend as he "sought control of the
estate" and "petitioned the court to become administrator." Id. In support of its holding, the
supreme court observed that the report omitted mention that the purported decedent's will had
named the "mutual friend" as independent executor and that the primary beneficiary of the funds
was to be the decedent's father. Id. The supreme court concluded that, because of these selective
omissions and juxtapositions of facts, the report was susceptible to the false and defamatory meaning
that Turner had taken these actions on his own volition and perhaps was seeking to benefit personally
from the "death." Id.

 Although it is theoretically possible for a report comprised of otherwise non-actionable third-party allegations to nonetheless convey a defamatory or false meaning through
the selective juxtaposition or omission of other material facts, as appellees seem to acknowledge,
Neely cannot identify any such juxtapositions or omissions here. The "juxtaposition" of which
Neely complains seems to be that the KEYE defendants included Paul Jetton's statements in the
broadcast to create the "misleading impression" that Jetton's allegations were true. As for "omitted"
material facts, Neely merely contrasts Paul's allegations with the actual content of the Board's order. 
Without more, we believe that McIlvain precludes us from holding that these aspects of the broadcast
can be considered to convey the sort of false or defamatory impression that could support a libel
claim against the KEYE defendants. To the contrary, this is a case closer to Randall's, in which
Neely is advocating the imposition of defamation liability based on additional but unstated
inferences that he would derive from a "substantially true" report of third-party allegations. See
Randall's Food Mkts., Inc., 891 S.W.2d at 646.

 In sum, we conclude that, as a matter of law, the KEYE defendants did not
make actionable assertions that Neely had operated on patients while under the influence of the
medications he had self-prescribed or that the Board had disciplined him for such actions. To the
extent that Neely complains that the KEYE defendants asserted that he had been disciplined by the
Board for "taking dangerous drugs," those assertions are "substantially true" under Texas law.


 Surgeries

 Neely also asserts that the broadcast created the defamatory and false "impression"
that he performed unnecessary surgeries. He complains in particular of Sheila Jetton's statement that
"[e]very neurosurgeon that's looked at Paul's MRIs from before Neely operated on him have said
they never would have done surgery [but] would have watched him with MRIs over years." Sheila's
assertion was immediately preceded by Wilson's statement, "Paul's wife Sheila says what they
learned from other doctors was the final blow." Thus, considering these statements together, Sheila
is making an allegation regarding what "other doctors" told the Jettons about the necessity or
advisability of surgery. Under McIlvain, this accurate depiction of Sheila's statement is not
actionable because it is considered to be "substantially true." See McIlvain, 794 S.W.2d at 16. Nor
does Neely identify any juxtaposition or omission of facts that would cause the broadcast as
a whole to convey an actionably false impression regarding the necessity of Paul's surgery. See
Turner, 38 S.W.3d at 117-19. To the contrary, the broadcast included Wilson's acknowledgment
of Neely's position that "two highly qualified neurosurgeons who reviewed the case agree with the
medical decisions made by Dr. Neely." In short, the gist of this aspect of the broadcast is that the
Jettons and some doctors were of the opinion that Paul's surgery had not been indicated while
other doctors believed it was. Neely has not raised a fact issue as to whether the broadcast was not
substantially true with respect to the necessity of Paul's surgery. See McIlvain, 794 S.W.2d at 16.

 Neely also asserts that the broadcast created a false impression that he had performed
surgery on Wei Wu to treat brain cancer that had never actually existed. The broadcast, as previously
noted, displayed a video clip of Neely testifying during his deposition that Wu "was found to have
a . . . very major brain tumor thought to be a meningioma at the time because it, of the location in
the brain . . . was taken to the OR thereafter and found to [have] malignant melanoma." It then
proceeded to emphasize the impact of the "diagnosis that Wu had only a few months to live,"
concluding with Wilson's suggestion that "[i]t may have been too much for Wei Wu to handle"
and her account of Wu's suicide. Then, as a visual image of the autopsy report was displayed on the
television screen, Wilson proceeded to recount, "But when his body was sent to the Travis County
Medical Examiner's office analyzing Wu's brains, examiners noted no residual metastatic
melanoma." As Wilson made this statement, the phrase "no residual metastatic melanoma" in
the image of the report was highlighted and enlarged to cover the entire width of the screen. Wilson
then offered her own explanation of that phrase's significance: "Meaning Wei Wu did not
have brain cancer."

 Neely insists that Wilson's statement, "Meaning Wei Wu did not have brain cancer"
could be perceived by an ordinary viewer as an assertion that Wu had never had cancer after all--
i.e., that for some inexplicable reason (or, e.g., the influence of self-prescribed medications) Neely
had performed brain surgery on Wu to treat a "very major brain tumor" that was never really there.
Appellees counter that the broadcast's gist was instead that Neely and the medical examiner had
differed as to whether Wu had any cancer remaining in his brain after Neely's surgery. In support,
appellees emphasize the examiner's phrase "no residual metastatic melanoma" (a phrase that
was highlighted and enlarged in the visual portion of the broadcast), the broadcast indication that
Wu's autopsy had occurred after Neely had performed surgery, and the fact that Wilson's statement
is a present-tense description of whether Wu had cancer at that time, not an assertion that he
never had brain cancer. We agree with appellees. Considering the broadcast as a whole, see Turner,
38 S.W.3d at 114, we conclude as a matter of law that a viewer of ordinary intelligence would
necessarily perceive Wilson's no-cancer explanation to refer to Wu's condition after Neely had
performed surgery, not as an assertion as to whether Wu had ever had cancer. The broadcast's
depiction of the competing views of Neely and the medical examiner regarding the continued
presence of cancer, furthermore, was substantially true. See McIlvain, 794 S.W.2d at 16; see also
Randall's Food Mkts., Inc., 891 S.W.2d at 646 (absent factual omissions and juxtapositions, a
substantially true account of facts is not actionable, regardless of any false or defamatory facts a
viewer might infer from that account). In sum, Neely has not raised a fact issue as to whether the
broadcast was not substantially true with respect to whether he performed unnecessary surgeries.


 Hand tremors

 Finally, Neely argues that the broadcast created the false and defamatory impression
that he suffered from hand tremors that impacted his surgical competence. The broadcast mentions
hand tremors in the anchors' introductory remarks ("If you needed surgery would you want to know
if your surgeon . . . had a history of hand tremors . . . ?") and in Wilson's summary of the Board's
findings ("The board found Neely had a history of hand tremors . . . ."). This is an accurate depiction
of the Board's agreed order. The order, as previously explained, included findings that Neely "had
a prior history of tremors," and that "the Board's investigator claims to have witnessed a
tremor during the 2002 interview" (which Neely did not dispute but attributed to "nervousness about
the interview"). Further, the Board ordered that Neely undergo evaluation by a Board-approved
physician for any condition which, without adequate treatment, could adversely affect Neely's ability
to safely practice medicine. We conclude, as a matter of law, that the broadcast was substantially
true with respect to its account of Neely's "history of hand tremors." See McIlvain, 794 S.W.2d
at 16. As for Neely's assertion that this substantially correct portrayal created the "impression" that
hand tremors impacted his surgical competence, this additional inference is not actually stated in the
broadcast. See Randall's Food Mkts, Inc., 891 S.W.2d at 646. 


 Conclusion regarding defamatory meaning and substantial truth 

 Under McIlvain, we conclude that, as a matter of law, the KEYE defendants
(KEYE and Wilson) stopped short of making actionable defamatory and false assertions about
Dr. Neely in their January 19, 2004 broadcast. We hold that the district court did not err in granting
summary judgment on the grounds that the statements in question were, as a matter of law, not
actionable because they are considered to be either "substantially true" or not defamatory.


Remaining issues

 The foregoing holdings would require us to affirm summary judgment as to all
of Neely's claims unless there is merit to Neely's seventh issue, in which he contends that
the district court abused its discretion in excluding some of his summary-judgment evidence. 
Two evidentiary rulings are the focus of Neely's seventh issue. First, Neely complains of the
district court's exclusion of certain excerpts from the affidavits of two of his attorneys, the
attorney who represented him in his medical-malpractice litigation and the attorney who represented
him before the Board. These excerpts concern communications the attorneys had with Wilson
prior to the broadcast which, in Neely's view, are relevant to Wilson's actual malice. Because the
summary judgment can stand on grounds other than absence of evidence of fault, any error in the
district court's exclusion of these excerpts is harmless. See Tex. R. App. P. 44.1(a)(1).

 The second evidentiary ruling of which Neely complains is the district court's
exclusion of the two letters from the Board concerning its investigations of complaints regarding
Neely's care of Paul Jetton and a group of patients that included Wu. Each letter, as previously
discussed, indicates that the Board had found no violation of the medical practice act and was closing
its investigation. Appellees objected to each letter as "irrelevan[t] and inadmissible hearsay if
offered for the truth." The district court sustained the objection without specifying the grounds. On
appeal, Neely argues that the letters are relevant to show that "the gist and impressions created by
the Broadcast are false." In light of our holdings regarding the broadcast's meaning and third-party
allegations, we cannot conclude that Neely has shown harm from any error in these rulings. See id.
We overrule Neely's seventh issue.

 The district court did not err in granting summary judgment on the grounds that, as
a matter of law, the KEYE defendants did not make actionably defamatory or false (i.e., not
substantially true) assertions in the broadcast and that Viacom had no involvement in preparing or
publishing the broadcast. Accordingly, we overrule Neely's first and second issues. We do not
reach--and express no opinion regarding--Neely's remaining issues challenging appellees' other
summary-judgment grounds. (9) See Tex. R. App. P. 47.1.


CONCLUSION

 We affirm the district court's judgment.



 _____________________________________________

 Bob Pemberton, Justice

Before Justices Pemberton, Rose and Goodwin

Affirmed

Filed: February 9, 2011
1. Because Paul Jetton and Sheila Jetton had the same last name, for clarity we will refer to
them by their first names.
2. Neely attributed this complaint to Sheila Jetton.
3. Section 164.051(a)(4) provides in full: 



The board may refuse to admit a person to its examination or refuse to issue a license
to practice medicine and may take disciplinary action against a person if the person:


* * * 


(4) is unable to practice medicine with reasonable skill and safety to patients because
of:


 (A) illness;


 (B) drunkenness;


 (C) excessive use of drugs, narcotics, chemicals, or another substance; or


 (D) a mental or physical condition


Tex. Occ. Code Ann. § 164.051(a)(4) (West 2004) (emphasis added).
4. Among other research, Wilson stated that she obtained a February 2003 report from
Public Citizen, "Medical Misdiagnosis in Texas: Challenging the Medical Malpractice Claims of
the Doctors' Lobby." The report included a section titled "Where's the Doctor Watchdog?" that was
critical of the frequency and severity of the Board's discipline of doctors.
5. The audio portion of the report as broadcast consisted of the following statements:


The city's public integrity section is investigating the use of city employees for
private work in the home of the city water maintenance manager.


The employees of the city water maintenance division say four payroll employees
were used, on city time, to care for the elderly father of Emerick Jacobs, the manager
of water department maintenance division.


The employees say they were sent by a supervisor each day to the manager's home
to care for his father and do other tasks around the house.


On top of this, these same employees are putting in for overtime so they could get
their city jobs done later on.




Police investigators who are conducting the investigation were looking for a
gun, but they didn't find the gun at the Dalton Street Water Facility. They found
liquor bottles. One city employee says drinking on the job there is not so unusual. 


The information about the alleged theft of City time may be turned over to a
grand jury. Judd McIlvain, News Center 11. 


McIlvain v. Jacobs, 794 S.W.2d 14, 15 (Tex. 1990). 
6. The Fourteenth Court has also relied on Felder for this proposition in subsequent decisions. 
See Dolcefino v. Randolph, 19 S.W.3d 906, 918 (Tex. App.--Houston [14th Dist.] 2000, no pet.)
("When, as here, a case involves media defendants, the defendants need only prove that the
third party allegations reported in the broadcast were, in fact, made and under investigation;
they need not demonstrate the allegations themselves were substantially true."); Dolcefino v. Turner,
987 S.W.2d 100, 109 (Tex. App.--Houston [14th Dist.] 1998) ("This court has recently interpreted
McIlvain to require only proof that third party allegations reported in the questioned broadcast
were made and under investigation in order to prove substantial truth; media defendants need
not demonstrate the underlying allegations are substantially true."), aff'd on other grounds, Turner
v. KTRK Television, Inc., 38 S.W.2d 103 (Tex. 2000).
7. Appellees also assert that Neely "conceded that the third-party allegation rule is 'the rule of
law' in Texas" in his summary-judgment response. We disagree. Neely's grounds for denying
summary judgment included assertions that the gist of the broadcast was false and defamatory and
that the summary-judgment evidence raised fact issues in that regard. He argued that various specific
third-party allegations were defamatory, false, and actionable. In claiming that Neely conceded the
validity of the "third-party allegation rule," appellees rely on a statement to the effect that this "rule,"
as it has been recognized by Texas courts of appeals, would not apply in this case because it is
limited to reporting "that the third-party allegations were in fact made and accurately reported
and that the allegations were under investigation." (Emphasis in original). In this regard, Neely
goes on to argue that "the Broadcast was reporting on past allegations, which do not fall under the
third-party allegation rule in Texas," and that, in any event, "the theory does not allow the media to
publish defamatory falsehoods uttered by third parties regardless of their context, or their own
knowledge of falsity." In a subsequent brief, Neely was more explicit that "the so-called 'third-party
allegation rule'" does not correctly reflect Texas law, advocating essentially the same arguments he
advances now. We conclude that Neely has preserved his arguments that we must consider not only
whether appellees accurately reported the various third-party allegations contained in the broadcast,
but also whether the underlying third-party allegations were in themselves defamatory or not
substantially true.
8. While relying primarily on their "third-party allegation rule," appellees argue that
Paul Jetton's statements would not be actionable even in themselves because they represent Paul's
"opinions" or "rhetorical hyperbole" rather than actionable assertions of fact. This argument alludes
to the principle that the First Amendment may, in certain contexts, restrict defamation liability
for utterances that cannot reasonably be interpreted as stating actual facts about an individual. See
New Times, Inc. v. Isaacks, 146 S.W.3d 144, 155-61 (Tex. 2004); Bentley v. Bunton, 94 S.W.3d 561,
579-81 (Tex. 2003) (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 19-20 (1990)). Assuming
without deciding that this limitation would apply to Paul's statements here, we cannot conclude, as
a matter of law, that the statements cannot be reasonably interpreted to state actual facts
about Neely--that Neely had operated on patients while under the influence of self-prescribed
"[n]arcotics, opiates."

9. I.e., Neely's third, fifth and sixth issues.